(Slip Opinion) OCTOBER TERM, 2006 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## BREWER *v*. QUARTERMAN, DIRECTOR, TEXAS DE-PARTMENT OF CRIMINAL JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

No. 05–11287.   Argued January 17, 2007—Decided April 25, 2007

Petitioner Brewer was convicted of murder committed during the course of a robbery. At sentencing, he introduced mitigating evidence of his mental illness, his father's extensive abuse of him and his mother, and his substance abuse. His counsel made the strategic decision not to present any expert psychological or psychiatric testimony. The trial judge rejected all of Brewer's proposed instructions designed to give effect to the mitigating evidence he presented, instructing the jury instead to answer only two special issues: whether his conduct was committed deliberately and with the reasonable expectation it would result in his victim's death and whether it was probable he would commit future violent acts constituting a continuing threat to society. In closing argument, the prosecutor emphasized that Brewer's violent response to physical abuse by his father supported an affirmative answer to the "future dangerousness" special issue; he deemphasized any mitigating effect such evidence should have, stressing that the jurors lacked the power to exercise moral judgment and, in determining Brewer's sentence, must answer the questions according to the evidence. Ultimately, the jury answered both special issues in the affirmative, and Brewer was sentenced to death. The Texas Court of Criminal Appeals (CCA) affirmed on direct appeal and denied Brewer's application for state postconviction relief. He then filed a federal habeas petition. Following supplemental briefing concerning *Tennard* v. *Dretke*, 542 U. S. 274, the District Court granted conditional relief, but the Fifth Circuit reversed and rendered its own judgment denying the petition.

Syllabus

*Held:* Because the Texas capital sentencing statute, as interpreted by
    the CCA, impermissibly prevented Brewer's jury from giving mean-
    ingful consideration and effect to constitutionally relevant mitigating
    evidence, the CCA's decision denying Brewer relief under *Penry* v. *Ly-
    naugh,* 492 U. S. 302 *(Penry I),* was both "contrary to" and "involved
    an unreasonable application of, clearly established Federal law, as de-
    termined [this] Court," 28 U. S. C. §2254(d).  Pp. 5–9.

    (a) Brewer's trial was infected with the same constitutional error
    that occurred in *Penry I,* where the Court held that jury instructions
    that merely articulated the Texas special issues, without directing
    the sentencing jury "to consider fully Penry's mitigating evidence as
    it bears on his personal culpability," did not provide an adequate op-
    portunity for the jury to decide whether that evidence might provide
    a legitimate basis for imposing a sentence other than death.  492
    U. S*.,* at 323.  The Court characterized Penry's mental-retardation
    and childhood-abuse evidence as a "two-edged sword" that "dimin-
    ish[ed] his blameworthiness for his crime even as it indicat[ed] a
    probability" of future dangerousness.  *Id.,* at 324.  Brewer's mitigat-
    ing evidence similarly served as a "two-edged sword."  Even if his
    evidence was less compelling than Penry's, that does not justify the
    CCA's refusal to apply *Penry I* here.  It is reasonably likely the jurors
    accepted the prosecutor's argument to limit their decision to whether
    Brewer had acted deliberately and was likely a future danger, disre-
    garding any independent concern that his troubled background might
    make him undeserving of death.  Also unpersuasive is the Fifth Cir-
    cuit's explanation that Brewer's lack of expert evidence and that
    court's precedents holding that mental retardation, but not mental ill-
    ness, can give rise to a *Penry I* violation prompted the Circuit's rever-
    sal of the grant of habeas relief.  This Court has never suggested that
    the question whether the jury could have adequately considered miti-
    gating evidence is a matter purely of quantity, degree, or immutabil-
    ity.  Rather, the Court has focused on whether such evidence has
    mitigating relevance to the special issues and the extent to which it
    may diminish a defendant's moral culpability for the crime.  See *id.,*
    at 322.  Pp. 5–7.

    (b) Under the narrowest possible reading of *Penry I*, Texas' special
    issues do not provide for adequate jury consideration of mitigating
    evidence that functions as a "two-edged sword."  The Fifth Circuit's
    mischaracterization of the law as demanding only that such evidence
    be given "sufficient mitigating effect," and improperly equating "suf-
    ficient effect" with "full effect," is not consistent with the reasoning of
    *Penry* v. *Johnson*, 532 U. S. 782 *(Penry II),* which issued after Penry's
    resentencing (and before the Fifth Circuit's opinion in this case).
    Like the "constitutional relevance" standard rejected in *Tennard*, a

Syllabus

"sufficient effect" standard has "no foundation" in this Court's decisions. 542 U. S., at 284. For the reasons explained in this case and in *Abdul-Kabir*, *ante,* p. \_\_\_, the Circuit's conclusions that Brewer's mental-illness and substance-abuse evidence could not constitute a *Penry* violation, and that troubled-childhood evidence may, because of its temporary character, fall sufficiently within the special issues' ambit, fail to heed this Court's repeated warnings about the extent to which the jury must be allowed not only to consider mitigating evidence, or to have such evidence before it, but to respond to it in a reasoned, moral manner and assign it weight in deciding whether a defendant truly deserves death. Pp. 7–9.

442 F. 3d 273, reversed.

STEVENS, J., delivered the opinion of the Court, in which KENNEDY, SOUTER, GINSBURG, and BREYER, JJ., joined. ROBERTS, C. J., filed a dissenting opinion, in which SCALIA, THOMAS, and ALITO, JJ., joined. SCALIA, J., filed a dissenting opinion, in which THOMAS, J., joined, and in which ALITO, J., joined as to Part I.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

———————

No. 05–11287

———————

## BRENT RAY BREWER, PETITIONER *v.* NATHANIEL QUARTERMAN, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

[April 25, 2007]

JUSTICE STEVENS delivered the opinion of the Court.

This is a companion case to *Abdul-Kabir* v. *Quarterman, ante,* p. \_\_. Like the petitioner in that case, petitioner Brent Ray Brewer claims that the former Texas capital sentencing statute impermissibly prevented his sentencing jury from giving meaningful consideration to constitutionally relevant mitigating evidence.

In *Penry* v. *Lynaugh,* 492 U. S. 302 (1989) *(Penry I)*, we held that jury instructions that merely articulated the Texas "special issues," without directing the jury "to consider fully Penry's mitigating evidence as it bears on his personal culpability," did not provide his sentencing jury with an adequate opportunity to decide whether that evidence might provide a legitimate basis for imposing a sentence other than death. *Id.,* at 323. We characterized the evidence of Penry's mental retardation and history of childhood abuse as a "two-edged sword," because "it may diminish his blameworthiness for his crime even as it indicates that there is a probability that he will be dangerous in the future." *Id.,* at 324.

As an overview of the cases both preceding and following *Penry I* demonstrates, we have long recognized that a sentencing jury must be able to give a "'reasoned moral response'" to a defendant's mitigating evidence—particularly that evidence which tends to diminish his culpability—when deciding whether to sentence him to death.  *Id.*, at 323; see also *Abdul-Kabir*, *ante*, at 10–20, 25–28.  This principle first originated in *Lockett* v. *Ohio,* 438 U. S. 586 (1978), and *Eddings* v. *Oklahoma*, 455 U. S. 104 (1982), in which we held that sentencing juries in capital cases "must be permitted to consider *any* relevant mitigating factor," *id.*, at 112 (emphasis added).  In more recent years, we have repeatedly emphasized that a *Penry* violation exists whenever a statute, or a judicial gloss on a statute, prevents a jury from giving meaningful effect to mitigating evidence that may justify the imposition of a life sentence rather than a death sentence.  See *Abdul-Kabir*, *ante*, at 25–28.  We do so again here, and hold that the Texas state court's decision to deny relief to Brewer under *Penry I* was both "contrary to" and "involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U. S. C. §2254(d).

I

In 1991, Brewer was convicted of murder committed during the course of a robbery.  At sentencing, he introduced several different types of mitigating evidence, including

> "that he had a bout with depression three months before the murder; that he was briefly hospitalized for that depression; that his co-defendant, a woman with whom he was apparently obsessed, dominated and manipulated him; that he had been abused by his father; that he had witnessed his father abuse his mother; and that he had abused drugs."  *Brewer* v. *Dretke*, 442 F. 3d 273, 275 (CA5 2006) *(per curiam)*

(footnotes omitted).[1]

As a result of a strategic decision on his counsel's part, Brewer neither secured nor presented any expert psychological or psychiatric testimony.

At the conclusion of the sentencing hearing, Brewer submitted several additional instructions designed to give effect to the mitigating evidence he did present. App. 81–87. The trial judge rejected all of his proposed instructions and instead instructed the jury to answer only two special issues:

> "'Do you find from the evidence beyond a reasonable doubt that the conduct of the defendant, BRENT RAY BREWER, that caused the death of the deceased, Robert Doyle Laminack, was committed deliberately and with the reasonable expectation that the death of the deceased would result?
>
> .          .          .          .          .
>
> "'Do you find from the evidence beyond a reasonable doubt that there is a probability that the defendant, BRENT RAY BREWER, would commit criminal acts

---

[1] On direct appeal, the Texas Court of Criminal Appeals (CCA) summarized the same evidence as follows:

"1) Appellant was not mentally retarded, but was involuntarily committed on January 1, 1990, for 'major depression, single episode, without psychotic features, polysubstance abuse.' The examining physician based his opinion on a suicide note appellant wrote to his mother. On January 25, appellant signed a request for voluntary admission to Big Springs State Hospital for fourteen days.

"2) Appellant came from an abused background where he was ignored by both his father and step-father. He did not have a relationship or live with his real father until after he was fifteen-years old. Appellant's father hit him on several occasions, once with the butt of a pistol and once with a flashlight. Appellant's father frequently beat his mother. Appellant's father had once told him, 'If you ever draw your hand back, you'd better kill me because I'll kill you.'

"3) Appellant had smoked marijuana when he was a teenager." *Brewer* v. *State*, No. 71,307 (June 22, 1994), p. 15, App. 140 (footnotes omitted).

of violence that would constitute a continuing threat to society?'"  442 F. 3d, at 277.

In closing argument, the prosecutor emphasized that Brewer's violent response to his father's extensive physical abuse of both Brewer and his mother supported an affirmative answer to the "future dangerousness" special issue.  In contrast, he deemphasized any mitigating effect that such evidence should have on the jury's determination of Brewer's fate:

> "And, you know, folks, you can take a puppy, and you can beat that puppy and you can make him mean, but if that dog bites, he is going to bite the rest of his life, for whatever reason.
>
> "Whatever got him to this point, he is what he is today.  And that will never change.  That will never change.
>
> "All that's happened to this time or all those years cannot change the violence and the cold, cold-bloodedness that he's exhibited right here.  Not one tear.  Not one tear, because life means nothing to him.  Zero.
>
> "You go back, you look at the evidence and you decide, not because of a poor family and not because of the survivors, because of the evidence that you see that he has shown."  App. 118.

The prosecutor stressed that the jurors lacked the power to exercise moral judgment in determining Brewer's sentence, admonishing them that "[y]ou don't have the power to say whether [Brewer] lives or dies.  You answer the questions according to the evidence, mu[ch] like you did at the guilt or innocence *[sic]*.  That's all."  *Id.*, at 114.  Ultimately, the jury answered both special issues in the affirmative, and Brewer was sentenced to death.

Brewer's conviction and sentence were affirmed on

direct appeal.[2]  *Brewer* v. *State*, No. 71,307 (Tex. Crim. App., June 22, 1994) (en banc), App. 122–171.  He then filed an application for state postconviction relief, which the Texas Court of Criminal Appeals (CCA) denied on January 31, 2001, over the dissent of three judges.[3]  *Ex parte Brewer*, 50 S. W. 3d 492 (2001) (*per curiam* order).

Brewer subsequently filed a federal habeas petition in the United States District Court for the Northern District of Texas.  After requesting supplemental briefing concerning *Tennard* v. *Dretke*, 542 U. S. 274 (2004), the District Court granted conditional relief.  *Brewer* v. *Dretke*, No. Civ.A.2:01–CV–0112–J (Aug. 2, 2004), App. 185–213.  On March 1, 2006, the United States Court of Appeals for the Fifth Circuit reversed the judgment of the District Court and rendered its own judgment denying the petition.  442 F. 3d, at 282.  We granted certiorari.  549 U. S. ___ (2006).

## II

Like the petitioner in *Abdul-Kabir*, Brewer contends that the same constitutional error that infected Penry's sentencing hearing occurred in his trial.  We agree.  As did Penry's, Brewer's mitigating evidence served as a "two-edged sword" because it tended to confirm the State's evidence of future dangerousness as well as lessen his

——————

[2] The CCA's opinion on direct appeal provides the only meaningful explanation by a Texas state court as to why Brewer's *Penry I* claim was denied.  See n. 5, *infra*.  When Brewer raised the same claim in his state postconviction proceedings, the trial court set forth, and the CCA adopted, a one-sentence ruling embracing the holding previously made on direct appeal: "The . . . special issues . . . were an adequate vehicle for the jury's consideration of the mitigating evidence . . . ."  App. 176; *Ex parte Brewer*, 50 S. W. 3d 492, 493 (2001) (*per curiam*).

[3] Judge Price filed a dissent to the order dismissing Brewer's postconviction application for relief, joined by Judges Johnson and Holcomb. *Id.*, at 493–495.  In the dissenters' view, Brewer had alleged a colorable claim of ineffective assistance of counsel, based on his counsel's failure to procure a mental health expert who could have examined him in preparation for trial.  *Id.*, at 493.

culpability for the crime.[4] *Penry I*, 492 U. S., at 324. It may well be true that Brewer's mitigating evidence was less compelling than Penry's, but, contrary to the view of the CCA, that difference does not provide an acceptable justification for refusing to apply the reasoning in *Penry I* to this case.[5] There is surely a reasonable likelihood that the jurors accepted the prosecutor's argument at the close of the sentencing hearing that all they needed to decide was whether Brewer had acted deliberately and would likely be dangerous in the future,[6] necessarily disregarding any independent concern that, given Brewer's troubled background, he may not be deserving of a death sentence.

Also unpersuasive in distinguishing the instant case

—————

[4] For example, the prosecution introduced the testimony of a police officer who had been called to quell a family dispute as evidence of Brewer's violent character. App. 6–15. The prosecution also introduced testimony from a doctor who treated Brewer's father after Brewer struck him with a broom handle in response to his father's attack on his mother. *Id.*, at 23–25.

[5] The CCA's opinion purporting to distinguish *Penry I* simply stated: "We conclude the second punishment issue provided an adequate vehicle for the jurors to give effect to appellant's mitigating evidence. We have held a stay in a mental hospital does not evidence a 'long term mental illness which would affect appellant's ability to conform to the requirements of society.' *Joiner* [v. *State*, 825 S. W. 2d 701, 707 (1992) (en banc)]. As in *Joiner*, the evidence shows no more than appellant's threat to commit suicide and a stay at a hospital on one occasion. *Id.* Further, appellant's evidence of drug abuse and an abusive homelife was given effect within the scope of the punishment issues. *Ex parte Ellis*, 810 S.W. 2d 208, 211–212 (Tex. Cr. App. 1991) (drug addiction); *Goss* v. *State*, 826 S.W. 2d 162, 166 (Tex. Cr. App. 1992) (abusive household)." No. 71,307, at 15, App. 141. In neither its opinion in this case nor in *Joiner* did the CCA explain why Brewer's evidence was not the same kind of "two-edged sword" as Penry's, other than to suggest that it was less persuasive. 492 U. S., at 324.

[6] "It's not a matter of life and death. It's whether it was deliberate. Was this act deliberate? Will he continue to commit violent acts? That's all you answer. And every one of you people told me you would base that not upon the result, but upon what the evidence dictates you must do." App. 115 (paragraph break omitted).

from others to which *Penry I* applies is the Fifth Circuit's explanation regarding the lack of expert evidence in Brewer's case (as compared to that presented by the petitioner in *Abdul-Kabir*) and its distinction between mental illness and mental retardation. In its opinion reversing the District Court's conditional grant of habeas relief, the Court of Appeals noted that, under its precedents, "[t]he only instances in which mental illness has given rise to *Penry I* violations involve those where the illness in question is chronic and/or immutable [as in the case of mental retardation]." 442 F. 3d, at 280. The court also emphasized the lack of expert psychiatric evidence in this case, contrasting the record below with that in *Abdul-Kabir*, and concluded that Brewer "came nowhere near to producing evidence sufficient for us to grant relief." 442 F. 3d, at 281. Nowhere in our *Penry* line of cases have we suggested that the question whether mitigating evidence could have been adequately considered by the jury is a matter purely of quantity, degree, or immutability. Rather, we have focused on whether such evidence has mitigating relevance to the special issues and the extent to which it may diminish a defendant's moral culpability for the crime. The transient quality of such mitigating evidence may make it more likely to fall in part within the ambit of the special issues; however, as we explained in *Penry I*, such evidence may still have "relevance to the defendant's moral culpability beyond the scope of the special verdict questions." 492 U. S., at 322 (citing and quoting *Franklin* v. *Lynaugh*, 487 U. S. 164, 185 (1988) (O'Connor, J., concurring in judgment)).

## III

Under the narrowest possible reading of our opinion in *Penry I*, the Texas special issues do not provide for adequate consideration of a defendant's mitigating evidence when that evidence functions as a "two-edged sword." As

the District Court explained in its opinion granting habeas corpus relief in this case:

> "The mitigating evidence presented may have served as a basis for mercy even if a jury decided that the murder was committed deliberately and that Petitioner posed a continuing threat. Without an instruction, much less a special issue on mitigation, this evidence was out of the jury's reach. Given the nature of the mitigating evidence before the jury and the lack of any instruction on mitigation, there is a reasonable likelihood that the jury applied its instructions in a way that prevented the consideration of the mitigating evidence. Reviewing the evidence in light of the special issues, a jury would be very hard pressed to see the evidence presented as anything but aggravating. Failure to submit an instruction on mitigation evidence was an unreasonable application of federal law and Supreme Court precedent. Accordingly, habeas relief on this issue is conditionally granted." No. Civ.A.2:01–CV–0112–J, at 9, App. 196.

In reversing the District Court's grant of habeas relief, and rejecting that court's conclusion that Brewer's mitigating evidence was effectively "out of the jury's reach," the Court of Appeals mischaracterized the law as demanding only that such evidence be given "sufficient mitigating effect," and improperly equated "sufficient effect" with "full effect."[7] This is not consistent with the reasoning of

---

[7] The Court of Appeals explained: "For the mitigating evidence to be within the effective reach of the jury in answering the special issues, the special interrogatories must be capable of giving relevant evidence constitutionally sufficient mitigating effect. Whether that sufficiency requires that the evidence be given 'full,' or merely 'some,' mitigating effect has been the subject of considerable discussion in this court, but ultimately the distinction is only one of semantics, because regardless of what label is put on the word 'effect,' it is indisputable that the effect must be constitutionally 'sufficient.' Even if the requirement is called

our opinion issued after Penry's resentencing (and before the Fifth Circuit's opinion in this case). See *Penry* v. *Johnson*, 532 U. S. 782 (2001) *(Penry II)*. Like the "'constitutional relevance'" standard that we rejected in *Tennard*, a "sufficient effect" standard has "no foundation in the decisions of this Court." 542 U. S., at 284.

For reasons not supported by our prior precedents, but instead dictated by what until quite recently has been the Fifth Circuit's difficult *Penry* jurisprudence, the Court of Appeals concluded that Brewer's evidence of mental illness and substance abuse could not constitute a *Penry* violation. It further concluded that "evidence of a troubled childhood may, as a result of its temporary character, fall sufficiently within the ambit of" the special issues. 442 F. 3d, at 280. For the reasons explained above, as well as in our opinion in *Abdul-Kabir*, these conclusions fail to heed the warnings that have repeatedly issued from this Court regarding the extent to which the jury must be allowed not only to consider such evidence, or to have such evidence before it, but to respond to it in a reasoned, moral manner and to weigh such evidence in its calculus of deciding whether a defendant is truly deserving of death. Accordingly, the judgment of the Court of Appeals is reversed.

*It is so ordered.*

––––––––––

'full,' it means nothing more than 'sufficient.'" *Brewer* v. *Dretke*, 442 F. 3d 273, 278–279 (CA5 2006) *(per curiam)* (footnote omitted).

# SUPREME COURT OF THE UNITED STATES

_____

Nos. 05–11284 and 05–11287

_____

JALIL ABDUL-KABIR, FKA TED CALVIN COLE,
PETITIONER
05–11284                 *v.*
NATHANIEL QUARTERMAN, DIRECTOR, TEXAS
DEPARTMENT OF CRIMINAL JUSTICE, COR-
RECTIONAL INSTITUTIONS DIVISION


BRENT RAY BREWER, PETITIONER
05–11287                 *v.*
NATHANIEL QUARTERMAN, DIRECTOR, TEXAS
DEPARTMENT OF CRIMINAL JUSTICE, COR-
RECTIONAL INSTITUTIONS DIVISION

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIFTH CIRCUIT

[April 25, 2007]

CHIEF JUSTICE ROBERTS, with whom JUSTICE SCALIA, JUSTICE THOMAS, and JUSTICE ALITO join, dissenting.

A jury imposed a sentence of death in each of these cases, despite hearing mitigating evidence from the defendants about their troubled backgrounds. The convictions and sentences were upheld on direct review. On state collateral review, each defendant claimed that the jury instructions did not allow sufficient consideration of the mitigating evidence. This Court had considered similar challenges to the *same* instructions no fewer than five times in the years before the state habeas courts considered the challenges at issue here. See *Jurek* v. *Texas*, 428 U. S. 262 (1976); *Franklin* v. *Lynaugh*, 487 U. S. 164 (1988); *Penry* v. *Lynaugh*, 492 U. S. 302 (1989) (*Penry I*);

*Graham* v. *Collins*, 506 U. S. 461 (1993); *Johnson* v. *Texas*, 509 U. S. 350 (1993). Four of the cases rejected the defendant's challenge. Only one—*Penry I*—upheld it. The guidance the Court gave in these five cases on whether the jury instructions at issue allowed sufficient consideration of mitigating evidence amounted to—it depends. It depends on the particular characteristics of the evidence in a specific case. The state courts here rejected the claim as applied to the particular mitigating evidence in these cases, and the defendants sought federal habeas review.

Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), however, a state-court decision can be set aside on federal habeas review only if it is "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U. S. C. §2254(d)(1). When this Court considers similar challenges to the same jury instructions five separate times, it usually is not because the applicable legal rules are "clearly established." The Court today nonetheless picks from the five precedents the *one* that ruled in favor of the defendant— *Penry I*—and anoints *that* case as the one embodying "clearly established Federal law." In doing so the Court fails to give any meaningful weight to the two pertinent precedents *subsequent* to *Penry I*—*Graham* and *Johnson*— even though those cases adopted a more "limited view" of *Penry I* than the Court embraces today. *Johnson, supra*, at 365. Indeed, the reading of *Penry I* in *Graham* and *Johnson* prompted every one of the remaining Justices who had been in the majority in *Penry I* on the pertinent question to dissent in *Graham* and *Johnson*, on the ground that the Court was failing to adhere to *Penry I*.

I suppose the Court today is free to ignore the import of *Graham* and *Johnson* on the question of what *Penry I* means, but in 1999 or 2001, respectively—when petitioners were denied collateral relief—the state courts did not

have that luxury. They should not be faulted today for concluding—exactly as the *Graham* and *Johnson* dissenters did—that the Court had cut back significantly on *Penry I.*

We give ourselves far too much credit in claiming that our sharply divided, ebbing and flowing decisions in this area gave rise to "clearly established" federal law. If the law were indeed clearly established by our decisions "as of the time of the relevant state-court decision," *Williams* v. *Taylor*, 529 U. S. 362, 412 (2000), it should not take the Court more than a dozen pages of close analysis of plurality, concurring, and even dissenting opinions to explain what that "clearly established" law was. *Ante*, at 10–24. When the state courts considered these cases, our precedents did not provide them with "clearly established" law, but instead a dog's breakfast of divided, conflicting, and ever-changing analyses. That is how the Justices on *this* Court viewed the matter, as they shifted from being in the majority, plurality, concurrence, or dissent from case to case, repeatedly lamenting the failure of their colleagues to follow a consistent path. Whatever the law may be today, the Court's ruling that 'twas always so—and that state courts were "objectively unreasonable" not to know it, *Williams*, *supra*, at 409—is utterly revisionist.

I

In 1987, Jalil Abdul-Kabir—referred to by his given name, Ted Calvin Cole, throughout this opinion, *ante*, at 1, n. 1—was convicted of capital murder after he confessed to strangling 66-year-old Raymond Richardson with a dog leash to steal $20 from him. Among the 21 claims Cole raised on state collateral review was a challenge under *Penry I*, 492 U. S. 302, to the application of Texas's special issue jury instructions. In evaluating Cole's challenge, the state habeas trial court stated:

"The issue is whether the sentencing jury had been

unable to give effect to [Cole's] mitigating evidence within the confines of the statutory 'special issues.' While [*Penry I*] held that evidence of a defendant's mental retardation and abused childhood could not be given mitigating effect by a jury within the framework of the special issues, the cases that followed such as *Graham v. Collins*, [506 U. S. 461] (1993), *Garcia v. State*, 919 S. W. 2d 370 (1996), *Mines v. State*, 888 S. W. 2d 816 (1994), and *Zimmerman v. State*, 881 S. W. 2d 360 (1994) held that the mitigating evidence of alcoholism, drug abuse, bad family background, bipolar disorder, low I.Q., substance abuse, head injury, paranoid personality disorder and child abuse were sufficiently considered under the special issues. The issue of whether the mitigating evidence can be sufficiently considered must be determined on a case by case basis, depending on the nature of the mitigating evidence offered and whether there exists other testimony in the record that would allow consideration to be given." App. in No. 05–11284, pp. 159–160.

Applying that standard, the state court concluded that "[t]he evidence presented at the punishment stage of the trial, especially evidence from [Cole's] expert witnesses, provide[d] a basis for the jury to sufficiently consider the mitigating evidence." *Id.,* at 161. The Texas Court of Criminal Appeals adopted the trial court's findings without substantive comment, and denied Cole's application for habeas corpus relief on November 24, 1999. *Id.,* at 178–179.

In finding that the state court's decision was objectively unreasonable, the Court begins by stating that the principle the state court violated was "firmly established," based on "[a] careful review of our jurisprudence in this area." *Ante*, at 10. The only thing clear about our jurisprudence on the pertinent question in 1999, however, is that it was

unsettled and confused.

In *Jurek*, the Court upheld Texas's use of the special issues as facially constitutional, with the controlling opinion noting that "the constitutionality of the Texas procedures turns on whether the enumerated questions allow consideration of particularized mitigating factors." 428 U. S., at 272 (joint opinion of Stewart, Powell, and STEVENS, JJ.). In so doing, *Jurek* left open the possibility that some mitigating evidence might not be within the reach of the jury under the special issues; other types of mitigating evidence, of course, would be. Cf. *id.,* at 272–273 (suggesting that the future dangerousness special issue allowed the jury to consider prior criminal conduct, age, duress, and whether the defendant was under extreme mental pressure).

The next occasion the Court had to consider mitigating evidence under the Texas special issues arose in *Franklin*, in which the Court concluded that the defendant's mitigating evidence of good behavior in prison was taken into account under the future dangerousness special issue. 487 U. S., at 178–179 (plurality opinion); *id.,* at 186–187 (O'Connor, J., concurring in judgment). A plurality of the Court also rejected the argument that a jury must be permitted to give "independent" effect to mitigating evidence—beyond the special issues—concluding that "this submission is foreclosed by *Jurek*" and rejecting the dissent's argument to the contrary. *Id.,* at 179–180, and n. 10; see also *id.,* at 199–200 (STEVENS, J., dissenting).

The Court today places great weight on the opinion by Justice O'Connor concurring in the judgment in *Franklin*, an opinion joined only by Justice Blackmun. *Ante*, at 15–18. That separate opinion expressed "doubts" about the plurality's view that mitigating evidence need not be given effect beyond the special issues, noting that *if* the petitioner in *Franklin* had introduced evidence not covered by the special issues, "we would have to decide whether the

jury's inability to give effect to that evidence amounted to an Eighth Amendment violation." 487 U. S., at 183, 185. The separate opinion concluded, however, that "this is not such a case." *Id.,* at 185. According to the Court today, a discerning state judge should have seen that federal law was "clearly established" on the point by the concurring and dissenting opinions, not the plurality. *Ante*, at 15–18.

*Penry I*, decided the following Term, concluded that *in that case* the Texas instructions did not allow the jury to give mitigating effect to evidence of Penry's mental retardation and abusive childhood. 492 U. S., at 328, 315 ("Penry does not . . . dispute that some types of mitigating evidence can be fully considered by the sentencer in the absence of special jury instructions. Instead, Penry argues that, *on the facts of this case*, the jury was unable to fully consider and give effect to the mitigating evidence . . . in answering the three special issues" (emphasis added; citations omitted)). In granting relief, the Court, quoting the *Franklin* concurrence, noted that Penry's evidence "'had relevance to [his] moral culpability beyond the scope of the special verdict questions,'" 492 U. S., at 322 (quoting 487 U. S., at 185 (O'Connor, J., concurring in judgment); some alterations deleted), and that it was relevant to the special issues "only as an *aggravating* factor." 492 U. S., at 323 (emphasis in original). According to the Court today, the views of the *Franklin* concurrence and dissent were thus elevated to the opinion of the Court in *Penry I*, again clearly establishing federal law. *Ante*, at 17–18, and n. 15. The four dissenters in *Penry I* complained that the Court's holding "flatly contradic[ted]" *Jurek*, and that in finding a constitutional violation, the Court was "throwing away *Jurek* in the process." 492 U. S., at 355, 354 (SCALIA, J., concurring in part and dissenting in part).

A state court looking at our pertinent precedents on the Texas special issue instructions would next have to con-

sider the significance of *Saffle* v. *Parks*, 494 U. S. 484 (1990). That case—issued less than nine months after *Penry I*—considered Oklahoma instructions, but extensively analyzed *Penry I* in doing so. See 494 U. S., at 491–492. The Court concluded that the mitigating evidence in that case could be adequately considered by the jury under the instructions given. The four dissenters in *Saffle*—including the author of today's opinion—complained that the majority's discussion of *Penry I* was "strangely reminiscent" of the position of the *Penry I* dissenters. 494 U. S., at 504 (opinion of Brennan, J.). The *Saffle* dissenters asserted that the majority's failure to reject the position of the *Penry I* dissenters "creates considerable ambiguity about which *Lockett* [v. *Ohio*, 438 U. S. 586 (1978)] claims a federal court may hereafter consider on habeas corpus review." 494 U. S., at 504–505.

In *Graham*, decided three years later, the Court sought to clarify the interplay between *Jurek*, *Franklin*, and *Penry I*:

> "It seems to us, however, that reading *Penry* as petitioner urges—and thereby holding that a defendant is entitled to special instructions whenever he can offer mitigating evidence that has *some* arguable relevance beyond the special issues—would be to require in all cases that a fourth 'special issue' be put to the jury: '"Does any mitigating evidence before you, whether or not relevant to the above [three] questions, lead you to believe that the death penalty should not be imposed?"' The *Franklin* plurality rejected precisely this contention, finding it irreconcilable with the Court's holding in *Jurek*, and *we affirm that conclusion today*." 506 U. S., at 476–477 (citation omitted; second emphasis added).

Thus, in *Graham* the Court rejected the reading of *Franklin* and *Penry I* that the Court today endorses, reasoning

that it would require a new sentencing in every case, and would be impossible to square with *Jurek*.[1]

Although the Court today tells us it was clear that the applicable federal law was established by the *Franklin* concurrence and dissent, and that *Penry I* had to be read in that light, *ante*, at 17–18, the Court majority in *Graham* specifically relied instead upon the *Franklin* plurality in rejecting the same broad reading of *Penry I* the Court resuscitates today, *nunc pro tunc. Graham*, *supra*, at 476–477. The dissenters in *Graham*—including every remaining Member of the *Penry I* majority—were adamant that *Penry I* should have been controlling in *Graham*. See, *e.g.*, 506 U. S., at 507 (opinion of SOUTER, J., joined by Blackmun, STEVENS, and O'Connor, JJ.) ("Our description of Penry's claim applies . . . almost precisely to Graham's claim"); *id.,* at 508 ("[Graham's] position is identical to that of Penry"); *id.,* at 512 ("*Penry* controls in this respect, and we should adhere to it"); *id.,* at 520 ("[T]he case is controlled by *Penry*"). The issue is not whether the majority or the dissenters in *Graham* were right about how to read *Penry I*, but whether it was reasonable for a state court in 1999 to read it the way the majority in *Graham* plainly did.

Later the same Term, in *Johnson*, the Court reaffirmed the "limited view of *Penry*" it had adopted in *Graham*. 509 U. S., at 365. Once again the Court majority specifically relied on the *Franklin* plurality—not the concurrence and

---

[1] In evaluating the state court's analysis, the Court criticizes its reliance on *Graham* because *Graham* primarily addressed retroactivity under *Teague* v. *Lane*, 489 U. S. 288 (1989). *Ante*, at 23. But in considering whether the rule requested was dictated by precedent, *Graham* of course had to evaluate the scope of that precedent—including *Penry I*—and did so extensively. See 506 U. S., at 467–477. Moreover, as explained below, the Court in *Johnson* v. *Texas,* 509 U. S. 350, 370–372 (1993), adopted the same reading of *Penry I* adopted in *Graham*, without considering the issue under *Teague*.

dissent. See 509 U. S., at 370–371. And once again the dissenters—including every remaining Member of the *Penry I* majority—lamented the Court's asserted failure to adhere to *Penry I*. 509 U. S., at 385–386 (opinion of O'Connor, J., joined by Blackmun, STEVENS, and SOUTER, JJ.). The dissent—by the *Penry I* author—made precisely the same point made by the Court today about how to read the *Franklin* concurrence and dissent. 509 U. S., at 385–386. The difference, of course, was that in *Johnson* the point was made in dissent. It cannot have been "objectively unreasonable" for a state court, in 1999, to have been guided by the *Johnson* majority on this question, rather than by the dissent.

In short, a state court reading our opinions would see an ongoing debate over the meaning and significance of *Penry I*. That state court would see four dissenters in *Graham* and *Johnson*—including every remaining Member of the *Penry I* majority—arguing that the Court was failing to follow or sharply limiting *Penry I* in those cases. On the flip side, the state court would see four dissenters in *Penry I*—every one later joining the majorities in *Graham* and *Johnson*—suggesting that the *Penry I* majority departed from *Jurek*. It is in that context that the Court today tells us that the state courts should have regarded *Penry I* as "clearly established Federal law, as determined by the Supreme Court of the United States." §2254(d)(1).

The Court asserts that *Graham* and *Johnson* did not "disturb the basic legal principle" at issue, *ante*, at 23, and that we cite no post-*Penry I* cases inconsistent with its reading of that case, *ante*, at 17, n. 14. I do not understand how the author of today's opinion can say that *Graham* did not disturb the principle of *Penry I*, however, when he joined a dissent in *Graham* stating that "[Graham's] position is *identical* to that of Penry" and that Graham's case "is controlled by *Penry*." 506 U. S., at 508, 520 (opinion of SOUTER, J.) (emphasis added). That would

seem to suggest that *Graham* was inconsistent with *Penry I.* I do not understand how the author of today's opinion can say that *Johnson* had no effect on *Penry I*, when he joined a dissent in *Johnson* stating that the majority opinion "upset our settled Eighth Amendment jurisprudence." 509 U. S., at 382 (opinion of O'Connor, J.). Now *Johnson* is dismissed as just an application of "basic legal principle[s]," over which Justices can disagree, *ante*, at 23; back then it "upset our settled Eighth Amendment jurisprudence." And what of *Saffle*? There the author of today's opinion joined a dissent claiming that the majority was adopting the rule rejected in *Penry I.* 494 U. S., at 504 (opinion of Brennan, J.). Again, that would seem to suggest inconsistency with *Penry I*.[2]

In fact, *Penry I* is not even consistent with the reading the Court ascribes to it—in that case the Court concluded that a jury could only view Penry's mitigating evidence as aggravating, and thus could not give the evidence *any* mitigating effect. 492 U. S., at 323 (Penry's evidence was "relevant only as an *aggravating* factor" (emphasis in original)); see also *Graham*, *supra*, at 473 ("Although Penry's evidence of mental impairment and childhood abuse indeed had relevance to the 'future dangerousness' inquiry, its relevance was *aggravating* only" (emphasis in original)). The Court concedes that Cole's evidence in the present case was not purely aggravating, see *ante*, at 24

—————

[2] The Court is correct that "[w]hat is most relevant under AEDPA . . . is the holdings set forth in majority opinions, rather than the views of dissenters . . . at the time those opinions were written." *Ante*, at 25, n. 22. But that must include the majority opinions in all the pertinent cases, not just the lone one of the bunch that ruled in favor of the defendant. Here it must include the subsequent majority opinions in *Saffle*, *Graham*, and *Johnson*, as well as in *Penry I*, and it was not objectively unreasonable for a state court to view *Saffle*, *Graham*, and *Johnson* the same way today's author did at the time—or at least to conclude that the Court's current view of *Penry I* was not as clearly established as the Court would have it today.

("[T]he jury could give mitigating effect to some of the experts' testimony"), thus drawing into even starker contrast the rule that was established by a fair reading of *Penry I* in 1999 versus the rule the Court today reads *Penry I* to have "clearly established."

As might be expected in light of the foregoing, judges called upon to apply these precedents were confused by the ambiguity of this Court's pronouncements. See, *e.g., Mines* v. *Texas*, 888 S. W. 2d 816, 820 (Tex. Crim. App. 1994) (Baird, J., concurring) ("The Supreme Court's holdings in *Penry*, *Graham* and *Johnson* do not provide an analytical framework to determine when our capital sentencing scheme fails to allow the jury to consider and give effect to mitigating evidence . . ."); see also *Brewer* v. *Dretke*, 442 F. 3d 273, 279, n. 16 (CA5 2006) (*per curiam*) (remarking, in applying *Graham* and *Penry I*, that "[t]here is no easy way to locate [the defendant] at either pole"). Commentators at the time likewise concluded that *Graham* and *Johnson* "put a cap on *Penry*'s principles." Denno, Testing *Penry* and Its Progeny, 22 Am. J. Crim. L. 1, 10 (1994) ("In *Graham*, the Court made clear that it did not interpret *Penry* 'as effecting a sea change' in its evaluation of the constitutionality of the former Texas death penalty statute . . ."). See also Twenty-Eighth Annual Review of Criminal Procedure, 87 Geo. L. J. 1756, 1770 (1999) ("The possible reach of *Penry* has been circumscribed by [*Graham*] and [*Johnson*]").

It is a familiar adage that history is written by the victors, but it goes too far to claim that the meaning and scope of *Penry I* was "clearly established" in 1999, especially in the wake of *Graham* and *Johnson*. In applying AEDPA, we have recognized that "[a] federal court may not overrule a state court for simply holding a view different from its own, when the precedent from this Court is, at best, ambiguous." *Mitchell* v. *Esparza*, 540 U. S. 12, 17 (2003) (*per curiam*); see also *Lockyer* v. *Andrade*, 538 U. S.

63, 72–73 (2003) (declining to find federal law "clearly established" when "our precedents in [the] area have not been a model of clarity").

When the state court rejected Cole's claim, it knew that mitigating evidence of mental retardation and severe childhood abuse could not be given effect under the special issues, *Penry I*, 492 U. S., at 328, but that evidence of youth and a transient upbringing could be, *Graham,* 506 U. S., at 476; *Johnson,* 509 U. S., at 368. The court concluded that Cole's mitigating evidence—a troubled childhood and "impulse control" disorder—was more like that considered in *Johnson* and *Graham* than in *Penry I.* And because Cole's mitigating evidence was not as troubling as that at issue in *Penry I*, the state court did not act unreasonably in concluding that the collateral damage of his upbringing and impulse control disorder would, like youth in *Johnson*, dissipate over time, so that Cole would be less of a danger in the future. It is irrelevant that the ill effects of Cole's upbringing and impulse control disorder might not wear off for some time—there was no suggestion in *Johnson* that the petitioner in that case would become less dangerous any time soon.

In other words, our precedents—which confirmed that the permanence of a mitigating feature was highly relevant, and that the correct answer was a case-specific matter turning on the particular facts—did not provide a clear answer, because the particular evidence before the court fell somewhere between the guideposts established by those precedents. As we have recognized, "the range of reasonable judgment can depend in part on the nature of the relevant rule. . . . [Some] rules are more general, and their meaning must emerge in application over the course of time." *Yarborough* v. *Alvarado*, 541 U. S. 652, 664 (2004). See also *Brown* v. *Payton*, 544 U. S. 133, 143 (2005) (reviewing state-court application of Supreme Court precedent "to similar but not identical facts" and

concluding that "[e]ven on the assumption that its conclusion was incorrect, it was not unreasonable, and is therefore just the type of decision that AEDPA shields on habeas review").

The state court's approach to the question was plainly correct; indeed, we engaged in a similar comparison in *Graham* itself in determining that the evidence presented in that case was cognizable under the special issues:

> "*Jurek* is reasonably read as holding that the circumstance of youth is given constitutionally adequate consideration in deciding the special issues. We see no reason to regard the circumstances of Graham's family background and positive character traits in a different light. Graham's evidence of transient upbringing and otherwise nonviolent character more closely resembles Jurek's evidence of age, employment history, and familial ties than it does Penry's evidence of mental retardation and harsh physical abuse." 506 U. S., at 476.

The state court thought that Cole's evidence "more closely resemble[d]" *Johnson* and *Graham* than *Penry I*. That cannot be said to be "contrary to, or . . . an unreasonable application of, clearly established Federal law." §2254(d)(1). See *Brown, supra*, at 143, 147; *Williams*, 529 U. S., at 411.

The Court further holds that the jury instructions did not permit Cole's evidence to have "mitigating force beyond the scope of the special issues," *ante*, at 21, as it now reads *Penry I* to require. At the time the state court ruled, however, *Graham* and *Johnson*, decided after *Penry I*, had expressly rejected the notion that a jury must "be able to give effect to mitigating evidence in every conceivable manner in which the evidence might be relevant," so long as the jury could consider "in some manner all of a defendant's relevant mitigating evidence." *Johnson, supra*, at

372–373. The state court found that Cole's mitigating evidence could be "sufficiently consider[ed]" by the jury "within the confines of the statutory 'special issues,'" App. in No. 05–11284, at 161, 159, a holding consistent with this Court's precedents as of 1999—and certainly not contrary to clearly established federal law.

In reaching today's result, the Court also takes advantage of eight years of hindsight and relies on three cases that postdate the state court's ruling. *Ante*, at 28 (citing *Penry* v. *Johnson*, 532 U. S. 782 (2001) (*Penry II*), *Tennard* v. *Dretke*, 542 U. S. 274 (2004), and *Smith* v. *Texas*, 543 U. S. 37 (2004) (*per curiam*)). What is pertinent under AEDPA, however, is whether federal law was clearly established by our decisions when the state court acted. *Williams*, *supra*, at 412.[3] AEDPA requires state courts to reasonably apply clearly established federal law. It does not require them to have a crystal ball.

## II

In 1991, petitioner Brent Ray Brewer was convicted of murder committed during the course of a robbery. Like Cole, Brewer claims that the Texas special issues prevented the jury from giving effect to mitigating evidence that he suffered from depression and had been abused as a teenager. The Texas courts rejected these claims on both direct and collateral review.

––––––––––

[3] The Court criticizes this dissent for failing "to define the rule" that our post-*Penry I* cases either did or should have applied. *Ante*, at 25, n. 22. But the whole point is that "the rule," far from being "clearly established" by our decisions, was—at the very least—unsettled and confused. Under AEDPA, those defending the finality of a state-court judgment challenged on federal habeas review do not have to show that the state-court judgment was consistent with some version of "clearly established Federal law" other than that offered by the challenger; AEDPA obviously contemplates that there *may not be* "clearly established Federal law." The Court's criticism only underscores how far the reasoning employed today strays from AEDPA's mandate.

In evaluating Brewer's claim, the Court focuses on the so-called "two-edged sword" nature of the evidence found to be beyond the jury's reach in *Penry I*, and concludes that Brewer's mitigating evidence is similarly double edged. The state court distinguished *Penry I*, however, stating that "a stay in a mental hospital does not evidence a long term mental illness which would affect appellant's ability to conform to the requirements of society," App. in No. 05–11287, p. 141 (internal quotation marks omitted), in contrast to Penry's "organic brain disorder . . . which made it impossible for him to appreciate the wrongfulness of his conduct or to conform his conduct to the law," *Penry I*, 492 U. S., at 309. The state court determined that the nature of Brewer's evidence allowed the jury to find that he would not be a future danger, whereas Penry's did not.

The Court rejects this distinction, noting that while Brewer's mitigating evidence may have been less compelling than Penry's, "that difference does not provide an acceptable justification for refusing to apply the reasoning in *Penry I* to this case." *Ante*, at 6, and n. 5. This misses the point. The state court's distinction goes not to the relative strength of the mitigating evidence, but rather its character—an episodic rather than permanent mental disorder. As discussed in the context of Cole, see *supra*, at 12, the distinction was not a "refus[al] to apply the reasoning in *Penry I*," *ante*, at 6, but rather an application of *Penry I* that can hardly be said to be "objectively unreasonable" based on this Court's decisions as of 2001. Indeed, in considering future dangerousness, it is difficult to imagine a more pertinent distinction than whether a mental condition is or is not permanent.

The Court concedes that "[t]he transient quality of [Brewer's] mitigating evidence may make it more likely to fall in part within the ambit of the special issues," and yet still finds the state court's decision unreasonable because the evidence may have had relevance beyond the special

issues. *Ante*, at 7. As in Cole's case, this conclusion squarely conflicts with the Court's rejection in *Graham* of the proposition that "a defendant is entitled to special instructions whenever he can offer mitigating evidence that has *some* arguable relevance beyond the special issues." 506 U. S., at 476 (emphasis in original). That rejection was confirmed in *Johnson*, see 509 U. S., at 372–373 (rejecting a rule that "would require that a jury be able to give effect to mitigating evidence in every conceivable manner in which the evidence might be relevant" in favor of the rule "that a jury be able to consider in some manner all of a defendant's relevant mitigating evidence"). Once again, the Court rejects the state court's reasonable reading of existing cases in favor of its own revisionist reading of this Court's doctrine, heavily informed by subsequent decisions that the state court had no means to predict.

## III

In AEDPA, Congress "work[ed] substantial changes" to the power of federal courts to grant habeas corpus relief. *Felker* v. *Turpin*, 518 U. S. 651, 654 (1996). In today's decisions, the Court trivializes AEDPA's requirements and overturns decades-old sentences on the ground that they were contrary to clearly established federal law at the time—even though the same Justices who form the majority today were complaining at that time that *this* Court was changing that "clearly established" law.

Still, perhaps there is no reason to be unduly glum. After all, today the author of a dissent issued in 1988 writes two majority opinions concluding that the views expressed in that dissent actually represented "clearly established" federal law at that time. So there is hope yet for the views expressed in *this* dissent, not simply down the road, but *tunc pro nunc*. Encouraged by the majority's determination that the future can change the past, I respectfully dissent.

# SUPREME COURT OF THE UNITED STATES

———————

Nos. 05–11284 and 05–11287

———————

JALIL ABDUL-KABIR, FKA TED CALVIN COLE,
PETITIONER
05–11284                    *v.*
NATHANIEL QUARTERMAN, DIRECTOR, TEXAS
DEPARTMENT OF CRIMINAL JUSTICE, COR-
RECTIONAL INSTITUTIONS DIVISION


BRENT RAY BREWER, PETITIONER
05–11287                    *v.*
NATHANIEL QUARTERMAN, DIRECTOR, TEXAS
DEPARTMENT OF CRIMINAL JUSTICE, COR-
RECTIONAL INSTITUTIONS DIVISION

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIFTH CIRCUIT

[April 25, 2007]

JUSTICE SCALIA, with whom JUSTICE THOMAS joins, and
with whom JUSTICE ALITO joins as to Part I, dissenting.

I remain of the view "that limiting a jury's discretion to
consider all mitigating evidence does not violate the
Eighth Amendment." *Ayers* v. *Belmontes*, 549 U. S. \_\_\_,
\_\_\_ (2006) (slip op., at 1) (SCALIA, J., concurring) (citing
*Walton* v. *Arizona*, 497 U. S. 639, 673 (1990) (SCALIA, J.,
concurring in part and concurring in judgment)).

I

But even under this Court's precedents to the contrary,
the state-court decisions in these two cases were hardly
objectively unreasonable under the Antiterrorism and
Effective Death Penalty Act of 1996, as THE CHIEF
JUSTICE's dissenting opinion demonstrates. That is all

which is needful to demonstrate the error of today's judg-
ments.  The full truth is worse than that, however.  There
was in fact clearly established law that governed these
cases, and it favored the State.  When the state courts
rendered their decisions, *Johnson* v. *Texas*, 509 U. S. 350
(1993), was this Court's most recent pronouncement on the
Texas special issues.  And in that case, the Court unambi-
guously drew back from the broader implications of its
prior decision in *Penry* v. *Lynaugh*, 492 U. S. 302 (1989)
*(Penry I)*.  Reiterating what it had recently said in *Gra-
ham* v. *Collins*, 506 U. S. 461, 475 (1993), the Court made
clear that "'[i]n *Penry*, the defendant's evidence was
placed before the sentencer but the sentencer had *no
reliable means* of giving mitigating effect to that evi-
dence.'"  *Johnson*, *supra*, at 366 (emphasis added).  *Penry
I*, said *Johnson*, stood for the proposition that habeas
relief was appropriate where jurors had been unable to
give *any* mitigating effect to the evidence at issue.  509
U. S., at 369; see also *Graham*, *supra*, at 475.  *Penry I* in
no way meant to imply, *Johnson* warned, "that a jury
[must] be able to give effect to mitigating evidence in *every
conceivable manner* in which the evidence might be rele-
vant."  509 U. S., at 372 (emphasis added).  *Johnson* thus
established, in no uncertain terms, that jurors need only
"be able to consider *in some manner* all of a defendant's
relevant mitigating evidence."  *Ibid.* (emphasis added); see
generally *id.*, at 372–373.

  The dissenters in *Johnson* very much disagreed with
that analysis.  They read *Penry I* for the more expansive
proposition that "the Texas special issues violated the
Eighth Amendment to the extent they prevented the jury
from giving *full* consideration and effect to a defendant's
relevant mitigating evidence."  509 U. S., at 385 (opinion
of O'Connor, J.) (citing *Penry I*, *supra;* emphasis added
and deleted).  "[H]aving *some* relevance to [a special]
issue," the dissent said, "was not sufficient."  509 U. S., at

385. And because youth (the mitigating feature in *Johnson*) had obvious relevance *beyond* the special issues, an additional instruction was needed. *Id.*, at 375. The differences between the *Johnson* majority and dissenters could not have been more pronounced.

Today the Court overrules *Johnson sub silentio,* and reinstates the "full effect" interpretation of *Penry I.* For as THE CHIEF JUSTICE explains, *ante*, at 12, 15 (dissenting opinion), it was not objectively unreasonable for the state courts to conclude that the ill effects of petitioners' mental illnesses and difficult childhoods would wear off in due time, allowing the jury to give that mitigating evidence *some effect* through the future dangerousness instruction—just as could be done for the mitigating factor of youth in *Johnson*. The Court nonetheless reverses these sentences because the juries were unable to give effect to "any independent concern" (independent, that is, of the Texas special issues) that the defendants "may not be deserving of a death sentence," *Brewer*, *ante*, at 6, or to consider the evidence's "relevance to the defendant's moral culpability beyond the scope of the special verdict questions," *id.,* at 7 (internal quotation marks omitted). The Court does not acknowledge that it is overruling *Johnson,* but makes the Court of Appeals the scapegoat for its change of heart.

The Fifth Circuit in both of these cases relied heavily on *Johnson* when denying relief. See *Cole* v. *Dretke*, 418 F. 3d 494, 505 (2005); *Brewer* v. *Dretke*, 442 F. 3d 273, 278, 281 (2006) (relying on *Cole*). How does the Court manage to distinguish it? The Court tries two main lines of argument. First, the Court explains:

> "A critical assumption motivating the Court's decision in *Johnson* was that juries would in fact be able to give mitigating effect to the evidence, albeit within the confines of the special issues. . . . Prosecutors in

some subsequent cases, however, have undermined this assumption, taking pains to convince jurors that the law compels them to disregard the force of evidence offered in mitigation." *Abdul-Kabir*, *ante*, at 26.

Because *Johnson*'s "critical assumption" has now been "undermined," the Court says, *Johnson* cannot be said to "foreclos[e] relief in these circumstances." *Abdul-Kabir, ante,* at 26.

This attempt to "distinguish" *Johnson* wilts under even the mildest scrutiny. Since when does this Court craft constitutional rules that depend on the beneficence of the prosecutor? (Never mind that this "critical assumption" of *Johnson* was not so critical as to be mentioned in the case.) And more importantly, how can prosecutorial style have *any* bearing on whether the Eighth Amendment requires a jury to be able to give "some effect," as opposed to "full effect," to a defendant's mitigating evidence? It is of course true that a prosecutor's arguments may be relevant evidence in the final analysis of *whether* a capital trial has met the "some effect" test. But it has absolutely no relevance to *which test* is selected in the first place.*

Second, the Court explains that "the consideration of the defendant's mitigating evidence of youth in *Johnson* could easily have directed jurors towards a 'no' answer with regard to the question of future dangerousness," whereas a juror considering petitioners' mitigating evidence "could feel compelled to provide a 'yes' answer to the same question." *Abdul-Kabir, ante,* at 27. But it is quite apparent that jurors considering youth in *Johnson* could also have

———————

*Relatedly, the Court thinks *Johnson* distinguishable because jurors have "experienced" youth but "have never experienced" the "particularized childhood experiences of abuse and neglect" at issue here. *Abdul-Kabir*, *ante*, at 25–26. It is again quite impossible to understand, however, how that can have any bearing upon whether "some effect" or "full effect" is the required test.

"fe[lt] compelled to provide a 'yes' answer" to the future dangerousness question. While one can believe that "the impetuousness and recklessness that may dominate in younger years can subside," *Johnson*, 509 U. S., at 368, one can also believe that a person who kills even in his younger years is fundamentally depraved, and more prone to a life of violent crime. *Johnson* itself explicitly recognized this point, denying relief despite "the fact that a juror might view the evidence of youth as aggravating, as opposed to mitigating." *Ibid.*

As the Court's opinion effectively admits, nothing of a legal nature has changed since *Johnson*. What *has* changed are the moral sensibilities of the majority of the Court. For those in Texas who have already received the ultimate punishment, this judicial moral awakening comes too late. *Johnson* was the law, until today. And in the almost 15 years in-between, the Court today tells us, state and lower federal courts in countless appeals, and this Court in numerous denials of petitions for writ of certiorari, have erroneously relied on *Johnson* to allow the condemned to be taken to the death chamber. See, *e.g.*, *Robison* v. *Johnson*, 151 F. 3d 256, 269 (CA5 1998) (denying petition for rehearing), cert. denied, 526 U. S. 1100 (1999) (petitioner executed Jan. 21, 2000); *Motley* v. *Collins*, 18 F. 3d 1223, 1233–1235 (CA5), cert. denied *sub nom. Motley* v. *Scott*, 513 U. S. 960 (1994) (petitioner executed Feb. 7, 1995).

## II

The individuals duly tried and executed between *Johnson* and today's decisions were not, in my view (my view at the time of *Johnson*, and my view now), entitled to federal judicial invalidation of their state-imposed sentences. That is because in my view the meaning of the Eighth Amendment is to be determined not by the moral perceptions of the Justices *du jour,* but by the understanding of

the American people who adopted it—which understanding did not remotely include any requirement that a capital jury be permitted to consider all mitigating factors. If, however, a majority of the Justices are going to govern us by their moral perceptions, in this area at least they ought to get their moral perceptions right the first time. Whether one regards improvised death-is-different jurisprudence with disdain or with approval, no one can be at ease with the stark reality that this Court's vacillating pronouncements have produced grossly inequitable treatment of those on death row. Relief from sentence of death because of the jury's inability to give "full effect" to all mitigating factors has been made available only to those who have managed to drag out their habeas proceedings until today. This is not justice. It is caprice.