# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

March 19, 2012

Lyle W. Cayce
Clerk

No. 10-70014

ROGER WAYNE MCGOWEN,

Petitioner–Appellee
Cross-Appellant,

v.

RICK THALER, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL
JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION,

Respondent–Appellant
Cross-Appellee.

Appeals from the United States District Court
for the Southern District of Texas
USDC No. 4:06-CV-3182

Before GARZA, CLEMENT, and OWEN, Circuit Judges.

PRISCILLA R. OWEN, Circuit Judge:

Petitioner Roger McGowen was convicted of capital murder in a Texas state court and sentenced to death.  He seeks federal habeas corpus relief from his conviction and death sentence on several grounds.  The district court held that, under *Penry v. Lynaugh*[1] and its progeny, McGowen was entitled to habeas relief with respect to his sentence because the punishment phase jury instructions failed to provide an avenue to give effect to mitigating evidence.

---

[1] (*Penry I*), 492 U.S. 302 (1989).

No. 10-70014

The district court denied habeas relief as well as certificates of appealability with respect to all of his other claims. The parties cross-appealed. We affirm.

## I

On March 11, 1986, a masked assailant fatally shot Marion Pantzer while attempting to rob a bar Pantzer owned in Houston, the "Just Marion and Lynn's Club" (the Club). Before the murder, a black male entered the Club. The bartender, Pedro Flores, noted the man's presence because the Club catered to a lesbian clientele. The man, who was later identified as McGowen's cousin, Kerwin Kindle, left sometime before the shooting.

At approximately 12:45 A.M., a masked man holding a large gun entered the Club and, while standing in a "shooting position," motioned to Flores in a manner Flores understood to mean the man wanted money from the cash register. As Flores walked toward the register, he noticed Pantzer, who was sitting on a stool at the end of the bar, reaching for her belt area where Flores knew she usually carried a gun. Flores saw Pantzer's gun, and as he prepared to open the register, he looked backed at the man. It was then that Flores saw fire come from the man's gun and heard two shots. The man fled immediately after firing. Flores did not know whether the man or Pantzer had fired the first shot.

The police found a .25 caliber pistol near Pantzer's body and a spent, small caliber bullet at the other end of the bar. It was Kindle, who had reentered the bar before the police arrived, who pointed out to the police the location of the bullet. The medical examiner subsequently removed a hollow point bullet from Pantzer's body.

The incident was similar to several other crimes in the immediate area, in which a group of men had been robbing homosexual bars and other businesses. McGowen, who had an extensive history of armed robbery, was arrested after being identified by a witness to another aggravated robbery.

2

No. 10-70014

McGowen signed two written statements while in custody. In the first, he admitted his involvement in several robberies in the area, including an attempted robbery at the Copa club that occurred a few weeks after Pantzer was shot. In the second, he admitted to shooting Pantzer but maintained he did so only because she had fired at him first. According to the statement, McGowen went to the Club with Kindle to rob it, and McGowen entered the Club wearing a gray ski mask and carrying a .38 revolver. Pantzer fired at him, and McGowen stated, "I guess it was just a frightened reaction by me but my gun went off."

McGowen was charged with capital murder, and McGowen and Kindle were indicted for aggravated robbery. McGowen's trial counsel attempted to suppress the confession, which was the only evidence linking him to the murder. The trial court denied the motion to suppress, concluding that the two statements "were voluntary, given after being properly warned by the officers, and made after knowingly and intelligently waiving the rights afforded to a defendant in custody."

In light of the confession, defense counsel chose not to challenge McGowen's identity as the killer at trial and instead challenged the intent requirement. After a one-day trial, the jury found McGowen guilty of capital murder. The jury charge required the jury to find that McGowen knowingly and voluntarily confessed to the offense as a prerequisite to relying on the confession to convict McGowen. In a separate punishment phase of the trial, then-applicable Texas law—Article 37.071(b) of the Texas Code of Criminal Procedure—required the jury to answer three special issue questions that would result in a death sentence if all were answered in the affirmative: "(1) whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result" (the deliberateness special issue); "(2) whether there is a probability that the defendant would commit criminal acts of violence

3

that would constitute a continuing threat to society" (the future-dangerousness special issue); and (3) "if raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased."

During the penalty phase, the prosecution called a number of witnesses who testified about McGowen's history of violence and criminal conduct. They testified that after being imprisoned for aggravated assault in 1982, McGowen was perpetually involved in theft and armed robbery in the years before Pantzer's murder, utilizing guns and knives and sometimes robbing the same establishments multiple times in a single day. McGowen had also agreed to kill a man in exchange for drugs, but instead robbed and shot him. The prosecution argued that unless a death sentence was imposed, McGowen's criminality would continue to escalate.

The defense called two of McGowen's sisters as its only witnesses at the punishment phase. They testified that McGowen had a disadvantaged background and vouched for his good character. Defense counsel argued in closing that McGowen's background contributed to the manner in which he dealt with life's problems.

The jury answered the three special issues in the affirmative, and McGowen was sentenced to death. On direct appeal, the Texas Court of Criminal Appeals affirmed the conviction and sentence. In its opinion, issued in 1992, the Texas court held that *Penry* did not require a separate special issue instruction to allow the jury to give mitigating effect to the evidence presented at the sentencing phase, noting that the court had "declined to extend *Penry* to include the type of evidence presented here." The Supreme Court denied certiorari on McGowen's direct appeal on October 12, 1993.[2]

---

[2] *McGowen v. Texas*, 510 U.S. 913 (1993).

No. 10-70014

In April 1997, McGowen filed an application for writ of habeas corpus in state court raising two issues: (1) whether the trial court should have instructed the jury on the lesser-included offense of simple murder; and (2) whether trial counsel provided ineffective assistance by failing to obtain a biopsychosocial assessment to use as mitigating evidence in the punishment phase. In August 1998, McGowen filed an amended habeas application raising the same two issues as well as several new issues, including that trial counsel inadequately investigated his innocence and inadequately presented mitigating evidence at the punishment phase of the trial.

The state habeas court recommended a denial of relief and issued findings of fact and conclusions of law addressing the merits of the issues raised in the initial and amended applications. The Texas Court of Criminal Appeals denied relief in September 2006, adopting the findings and conclusions as to the issues raised in the initial application and refusing to consider the claims in the amended application.[3] The Texas court held that the amended application constituted a "subsequent application" under Article 11.071 of the Texas Code of Criminal Procedure and dismissed the application on procedural grounds as an abuse of the writ.

In October 2006, McGowen commenced the underlying federal action by filing an application for writ of habeas corpus. The district court stayed the proceedings to allow McGowen to file a successive application in state court to exhaust newly brought claims, which the Texas Court of Criminal Appeals dismissed as an abuse of the writ.[4] McGowen's second amended petition in federal court raised sixteen claims relating to both the guilt/innocence phase and

---

[3] *Ex parte McGowen*, Nos. WR-64992-01 & WR-64992-02, 2006 WL 2615541 (Tex. Crim. App. Sept. 13, 2006) (unpublished).

[4] *Ex parte McGowen*, No. WR-64992-03, 2008 WL 5050080 (Tex. Crim. App. Nov. 26, 2008) (unpublished).

5

the punishment phase of his trial.  Respondent (the Director) sought summary judgment on all of the claims.

The district court held McGowen was entitled to habeas relief on his claim that the Texas special issue questions did not provide an adequate vehicle for consideration of McGowen's mitigating evidence as required by *Penry* and its progeny, and that the State was required to "either hold a new punishment hearing or commute McGowen's sentence to life imprisonment."  The court therefore did not address the remaining ten claims relating to the punishment phase.  Alternatively with respect to the sentencing claims, the district court held that all but three claims were procedurally barred and that those three claims lacked merit.  As to the claims relating to the guilt/innocence phase of the trial, the district court held they were procedurally barred, as McGowen had failed to comply with Texas's adequate and independent procedural requirements for presenting the claims. The district court also denied McGowen a certificate of appealability on the guilt/innocence claims.  The parties cross-appealed.

## II

The Antiterrorism and Effective Death Penalty Act (AEDPA) applies to this appeal.[5]  Under AEDPA, a petitioner who is in custody "pursuant to the judgment of a State court" is not entitled to federal habeas relief unless the adjudication on the merits of the petitioner's claims

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

---

[5] *See Neal v. Puckett*, 286 F.3d 230, 235 (5th Cir. 2002) (en banc) (per curiam) (noting that  AEDPA applies to all federal habeas petitions filed on or after April 24, 1996).

No. 10-70014

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.[6]

"[P]ure questions of law and mixed questions of law and fact are reviewed under § 2254(d)(1), and questions of fact are reviewed under § 2254(d)(2)."[7]

Regarding § 2254(d)(1),

[a] state court's decision is "contrary to" clearly established federal law if (1) the state court "applies a rule that contradicts the governing law" announced in Supreme Court cases, or (2) the state court decides a case differently than the Supreme Court did on a set of materially indistinguishable facts.[8]

"A state court's application of clearly established federal law is 'unreasonable' within the meaning of AEDPA when the state court identifies the correct governing legal principle from Supreme Court precedent, but applies that principle to the case in an objectively unreasonable manner."[9]

On appeal of a district court's grant or denial of the writ of habeas corpus, this court reviews findings of fact for clear error and conclusions of law de novo, "applying the same standard of review to the state court's decision as the district court."[10]

## III

The district court held that the special issue questions presented to the jury in the punishment phase of the trial did not provide an adequate vehicle for

---

[6] 28 U.S.C. § 2254(d).

[7] *Martin v. Cain*, 246 F.3d 471, 475 (5th Cir. 2001) (quoting *Corwin v. Johnson*, 150 F.3d 467, 471 (5th Cir. 1998)) (internal quotation marks omitted).

[8] *Nelson v. Quarterman*, 472 F.3d 287, 292 (5th Cir. 2006) (en banc) (quoting *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003)).

[9] *Id.* (citing *Wiggins v. Smith*, 539 U.S. 510, 520 (2003)).

[10] *See Ortiz v. Quarterman*, 504 F.3d 492, 496 (5th Cir. 2007) (citing *Thompson v. Cain*, 161 F.3d 802, 805 (5th Cir. 1998)).

consideration of McGowen's mitigating evidence as required by *Penry* and subsequent Supreme Court decisions. We agree.

The Supreme Court has issued several opinions involving challenges to Texas's capital sentencing scheme in effect at the time of McGowen's sentencing. In *Penry v. Lynaugh*, the Supreme Court considered an as-applied challenge to the three questions posed to the jury at the penalty hearing, which "do[] not explicitly mention mitigating circumstances, but rather direct[] the jury to answer [the] three questions" quoted above regarding deliberateness, future dangerousness, and provocation.[11]   Drawing on its prior jurisprudence, the Supreme Court held that, at the time Penry's conviction became final in 1986, the State "could not, consistent with the Eighth and Fourteenth Amendments, prevent the sentencer from considering and giving effect to evidence relevant to the defendant's background or character or to the circumstances of the offense that mitigate against imposing the death penalty."[12]   The Court continued,

> If the sentencer is to make an individualized assessment of the appropriateness of the death penalty, "evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse."[13]

The sentencer must "be able to consider and give effect to that evidence in imposing sentence," such that "the sentence imposed at the penalty stage should reflect a reasoned *moral* response to the defendant's background, character, and

---

[11]   (*Penry I*), 492 U.S. 302, 316 (1989).

[12]   *Id.* at 318.

[13]   *Id.* at 319 (quoting *California v. Brown*, 479 U.S. 538, 545 (1987) (O'CONNOR, J., concurring)).

crime."[14] The Court concluded that evidence of Penry's mental retardation and history of abuse had mitigating relevance to Penry's moral culpability beyond the scope of the special issue questions.[15] In addition, the prosecution had argued to the jurors at the sentencing phase that they "had taken an oath to follow the law, and that they must follow the instructions they were given in answering the special issues."[16] In light of that argument and the absence of an appropriate instruction, "the jury was not provided with a vehicle for expressing its 'reasoned moral response' to [the mitigating] evidence in rendering its sentencing decision."[17]

In *Tennard v. Dretke*, the Supreme Court considered the same capital sentencing scheme, evaluating whether it was inadequate for jurors to give effect to the petitioner's evidence of low intelligence.[18] Engaging in a two-step process, the Court first held that, in determining whether mitigating evidence is "relevant" in the context of a capital sentencing proceeding,

> the meaning of relevance is no different . . . than in any other context, and thus the general evidentiary standard—"any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence"—applies.[19]

The Court noted that certain evidence that does "not relate specifically to petitioner's culpability for the crime he committed" may nevertheless "be

---

[14] *Id.* (quoting *California*, 479 U.S. at 545 (O'CONNOR, J., concurring)) (internal quotation marks omitted) (citing *Hitchcock v. Dugger*, 481 U.S. 393 (1987)).

[15] *Id.* at 322.

[16] *Id.* at 325.

[17] *Id.* at 326, 328.

[18] 542 U.S. 274, 276 (2004).

[19] *Id.* at 284 (quoting *McKoy v. North Carolina*, 494 U.S. 433, 440 (1990)) (internal quotation marks omitted).

'mitigating' in the sense that [it] might serve 'as a basis for a sentence less than death.'"[20]

"Once this low threshold for relevance is met," the Court continued, "the Eighth Amendment requires that the jury be able to consider and give effect to a capital defendant's mitigating evidence."[21] In holding that the petitioner was entitled to a certificate of appealability on the district court's denial of his petition for a writ of habeas corpus, the Court determined "[r]easonable jurists could conclude" that Tennard's low IQ evidence was relevant mitigating evidence that had "mitigating dimension" beyond the scope of the special issue questions.[22] The Court also noted that the prosecution's closing arguments at the sentencing hearing "pressed exactly the most problematic interpretation of the special issues, suggesting that Tennard's low IQ was irrelevant in mitigation, but relevant to the question whether he posed a future danger."[23]

Most recently, the Supreme Court decided companion cases *Abdul-Kabir v. Quarterman*[24] and *Brewer v. Quarterman*.[25] The Court reaffirmed that the central principle discussed in *Penry*—"that sentencing juries must be able to give meaningful consideration and effect to all mitigating evidence that might provide a basis for refusing to impose the death penalty on a particular individual, notwithstanding the severity of his crime or his potential to commit similar offenses in the future"—was "firmly established" in the Court's

---

[20] *Id.* at 285 (alteration in original) (quoting *Lockett v. Ohio*, 438 U.S. 586, 604 (1978)) (internal quotation marks omitted).

[21] *Id.* (quoting *Boyde v. California*, 494 U.S. 370, 377-78 (1990)) (internal quotation marks omitted).

[22] *Id.* at 288-89.

[23] *Id.* at 289.

[24] 550 U.S. 233 (2007).

[25] 550 U.S. 286 (2007).

jurisprudence "well before" its decision in *Penry*.[26]  In *Abdul-Kabir*, the Court held that the Texas special issue questions did not allow meaningful consideration by the jury of the petitioner's mitigating evidence relating to his troubled childhood and lack of impulse control, which "did not rebut either deliberateness or future dangerousness but was intended to provide the jury with an entirely different reason for not imposing a death sentence."[27]  Similarly, in *Brewer*, the Court concluded that the mitigating evidence the petitioner had presented, including childhood abuse by his father and past problems with depression and drug abuse,[28] "served as a 'two-edged sword' because it tended to confirm the State's evidence of future dangerousness as well as lessen his culpability for the crime."[29]  In holding the petitioner was entitled to habeas relief, the Court dismissed the lack of expert psychiatric evidence as irrelevant to the analysis, noting that

> [n]owhere in our *Penry* line of cases have we suggested that the question whether mitigating evidence could have been adequately considered by the jury is a matter purely of quantity, degree, or immutability.  Rather, we have focused on whether such evidence has mitigating relevance to the special issues and the extent to which it may diminish a defendant's moral culpability for the crime.[30]

Relevant to the Court's holding in both cases were statements by the respective prosecutors discouraging the jurors from taking into account the mitigating

---

[26] *Abdul-Kabir*, 550 U.S. at 246.

[27] *See id.* at 259.

[28] *Id.* at 289-90.

[29] *Brewer*, 550 U.S. at 292-93 (quoting *Penry I*, 492 U.S. 302, 324 (1989)).

[30] *Id.* at 294.

No. 10-70014

aspect of the defense's evidence, while emphasizing the aggravating effect with respect to the special issues.[31]

## A

McGowen's conviction became final in 1993. The Supreme Court held in *Abdul-Kabir v. Quarterman*, that

> [a] careful review of our jurisprudence in this area makes clear that well before our decision in *Penry I* [(decided in 1989)], our cases had firmly established that sentencing juries must be able to give meaningful consideration and effect to all mitigating evidence that might provide a basis for refusing to impose the death penalty.[32]

Guided by the Supreme Court precedent discussed above, we consider McGowen's *Penry* claim.

As noted, during the punishment phase of the trial, McGowen presented the testimony of two of his sisters, Rhonda Edwards and Valerie McGowen. Edwards described McGowen's background and character as follows: McGowen had nine siblings, one of whom had died; he and Edwards had different fathers and McGowen's father was deceased at the time of trial; McGowen and Edwards had lived in the same house until McGowen was in fifth grade; he then went to live with his father and then his grandmother until his grandmother died; he had graduated from a vocational school; at the age of sixteen he had his own apartment; Edwards moved in with him when she was twelve or thirteen and pregnant; and he allowed several other people to stay in his apartment, including his girlfriend, his girlfriend's two children, an uncle, and Norman Willis, who had testified at the hearing about committing numerous crimes with McGowen. Edwards also testified as to McGowen's character, explaining that McGowen had been like a father-figure to her, had taught her "the right things

---

[31] *Id.* at 291, 293-94; *Abdul-Kabir*, 550 U.S. at 241-42, 261.

[32] *Abdul-Kabir*, 550 U.S. at 246.

to do," and had helped the family and taken care of her when their mother was on welfare. She also testified she would provide a home for him "[w]hen he gets out."

Valerie McGowen testified: when she lived with McGowen in 1984 and 1985, he worked "every day" at a restaurant to support his girlfriend and his girlfriend's children; he had graduated from a vocational school and was articulate and intelligent; and she would support him if he received a life sentence.

In closing arguments, defense counsel argued in pertinent part that McGowen's background—"growing up in Houston black, poor, uneducated, and from a broken home," as well as being responsible for others at such a young age—contributed to his inability to solve problems without resorting to crime and violence. Defense counsel specifically stated:

> [I]s there any among you who can deny that growing up in Houston black, poor, uneducated, and from a broken home is a considerably different experience than what most of us are used to? Life is solving problems. Life is learning how to cope with problems and overcoming problems that confront us every day. Is there any among you who think that Roger Wayne McGowen had the same chance, had the same ability, had the same intelligence to overcome problems confronting him that some of us did?
>
> He's sixteen or seventeen years old, and he's got an uncle. He's got a wife. He's got a sister. He's being followed by the likes of no-account Norman Willis. He's trying to hold a family together, solve their problems, help get them down the road of life, and he has to take care of himself. You need to consider that. You may reject it, but please consider it. God didn't give all of us the same ability to solve our problems.

Defense counsel continued:

> His career started at a very early age. He did it the wrong way. At sixteen years old after living with a series of relatives, a series of relatives, at sixteen years of age, he has his own home, his own apartment. He has no direction, but he's got a fourteen-year-old

sister to support, who was either pregnant at that time or had the baby living there with her.  He had Norman Ray Willis.  Norman Ray Willis had nowhere else to go. . . .

Then you heard about some uncle who lived there off and on, an older man, but who took care of everything?  Roger McGowen. His other sister testified that she lived with him, too.  She said he tried to help her. He graduated from Job Corps.  He was taking care of a wife or woman and also her two children.  He is the only sole support.

In rebuttal, the prosecution argued:

If you noticed, during the arguments, [defense counsel] didn't talk about the special issues.  He only talked about life or death, life or death.  He talked about what a hard job you've got, what a difficult job you have ahead of you, and how the State wanted to confuse you with all of this evidence.

The prosecution later stated:

Well, folks, we're talking about someone who has already taken a human life.  He's only killed one person.  After all, the whole idea of this [future-dangerousness] question is to keep someone else from dying down the road.  That's what you have to think about.  You've got the responsibility on your shoulders.  You're not here as social workers.  Since when has it been an excuse because you're poor or black or whatever you want to blame it on, since when does that or society take the blame?  "He never had a chance.  That's why he went and robbed somebody and killed somebody."

The prosecution went on to refer to that "excuse" as a "cop-out."

**B**

In reviewing McGowen's *Penry* claim, we must first determine if McGowen's mitigating evidence of a disadvantaged background and good character "satisfied the 'low threshold for relevance' articulated by the Supreme Court" in *Tennard*.[33]  Based on the Supreme Court jurisprudence discussed above, the law is clear that, generally, evidence of a troubled or disadvantaged

---

[33] *Coble v. Quarterman*, 496 F.3d 430, 444 (5th Cir. 2007) (quoting *Tennard v. Dretke*, 542 U.S. 274, 285 (2004)).

background has "relevance," as that term is broadly defined in *Tennard*, to a defendant's moral culpability.

The Director argues McGowen presented no such evidence of a disadvantaged background nor evidence linking his background to his character, but as the district court concluded, this position requires too narrow a construction of the evidence. There was testimony that, as a child, McGowen went from living with his mother to his father to his grandmother, and when his grandmother died, he was on his own at the age of sixteen, with a mother on welfare. At that point, he was also responsible for at least two of his younger sisters, one of whom was either pregnant or had a young child, as well as his girlfriend and her two children. This evidence may not indicate that McGowen was abused or neglected like the petitioners in *Penry* or *Brewer*, but evidence of abuse or neglect is not the only indication of a "troubled" or "disadvantaged" background that can be relevant to a defendant's moral culpability,[34] and the Supreme Court has never limited the standard in that way. Nor has this court so narrowly construed the Supreme Court's decisions. For example, in *Coble v. Quarterman*, the relevant mitigating evidence included evidence of a troubled childhood—the defendant's father died before he was born, his mother suffered a nervous breakdown when he was eleven, and he was sent to live at a state facility until he joined the Marines at seventeen—as well as evidence of mental illness.[35] In *Pierce v. Thaler*, we held that evidence of a troubled childhood, involving testimony that the defendant fell in with the wrong crowd as a

---

[34] *See Brewer v. Quarterman*, 550 U.S. 286, 294 (2007) (issue of whether mitigating evidence could have been adequately considered by a jury is not "a matter purely of quantity, degree, or immutability").

[35] 496 F.3d at 445-46.

teenager and spent time in juvenile detention, satisfied the "low threshold for relevance articulated by the Supreme Court."[36]

In *Smith v. Quarterman*, the only decision issued after *Abdul-Kabir* and *Brewer* in which this court denied habeas relief on a *Penry* claim, we denied relief on the ground that the purportedly mitigating evidence presented by the defendant—that he grew up in a poor, crime-infested area—"'has only a tenuous connection to the petitioner's moral culpability.'"[37]  The Director now relies heavily on *Smith* to argue that there was no witness testimony regarding the effect of McGowen's disadvantaged background on his character.  However, the court emphasized in *Smith* that "our holding here is a narrow one, based on our detailed review of the record which contains no evidence of a connection between the poverty and crime of the Fifth Ward and Smith's character."[38]  The court further held that the evidence did not amount to a "'particularized childhood experience of abuse and neglect'" requiring habeas relief.[39]  The evidence of "particularized childhood experiences" that was considered in the Supreme Court decisions had not been presented.

In this case, however, there was at least some such evidence, including McGowen's moving from home to home as a child and having to take full responsibility for himself and others at a very young age.  In addition, the defense specifically asked the jury to consider McGowen's disadvantaged background and its effect on his decisions and actions.  Moreover, McGowen is not required to establish a "nexus" between the mitigating evidence and the

---

[36]  604 F.3d 197, 206-08 (5th Cir. 2010) (quoting *Coble*, 496 F.3d at 444) (internal quotation marks omitted).

[37]  515 F.3d 392, 414 (5th Cir. 2008) (quoting *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 253 n.14) (2007)) (ellipsis and brackets omitted).

[38]  *Id.*

[39]  *Id.* (quoting *Abdul-Kabir*, 550 U.S. at 261).

crime.[40]  Instead, "the question is simply whether the evidence is of such a character that it might serve as a basis for a sentence less than death."[41]

## C

Having determined that the mitigating evidence satisfied the relevancy requirement, we must determine whether the jury was able to give the mitigating evidence meaningful effect without special instruction.[42]  "[S]pecial instruction is necessary when the defendant's evidence may have meaningful relevance to the defendant's moral culpability 'beyond the scope of the special issues.'"[43]  As argued by defense counsel in closing, the evidence of McGowen's background "did not rebut either deliberateness or future dangerousness but was intended to provide the jury with an entirely different reason for not imposing a death sentence."[44]  Without an additional instruction, the jury could not give meaningful effect to evidence of McGowen's disadvantaged background.

Citing the Supreme Court's plurality opinion in *Franklin v. Lynaugh*[45] and majority opinion in *Graham v. Collins*,[46] the district court in this case held that the special issues sufficiently allowed the jury to take into consideration evidence of McGowen's good character, just not of his disadvantaged background. This court's recent decision in *Pierce v. Thaler*,[47] however, holds otherwise.  In

---

[40]  *Tennard v. Dretke*, 542 U.S. 274, 287 (2004).

[41]  *Id.* (quoting *Skipper v. South Carolina*, 476 U.S. 1, 5 (1986)) (internal quotation marks omitted).

[42]  *See Abdul-Kabir*, 550 U.S. at 253 n.14.

[43]  *Id.* (quoting *Penry I*, 492 U.S. 302, 322-23 (1989)).

[44]  *Id.* at 259.

[45]  487 U.S. 164 (1988).

[46]  506 U.S. 461 (1993).

[47]  604 F.3d 197 (5th Cir. 2010).

No. 10-70014

*Pierce* we determined that the Supreme Court's jurisprudence on California's death penalty statute "establish[ed] that good character evidence has meaningful relevance to moral culpability, which a majority of the Justices in *Franklin* indicated is not encompassed by the special issues."[48]  Moreover, we emphasized that the statement in *Graham*—"that the special issues allowed the jury to give at least *some* effect to [good] character evidence"—was distinguished as dicta by the Supreme Court in *Abdul-Kabir* and, as we held in *Nelson*, did not "alter[] the requirement that the jury be able to give 'full consideration and full effect to the capital defendant's mitigating evidence.'"[49]

In any event, the Supreme Court's decision in *Abdul-Kabir* tells us that, under the clearly established law when McGowen's conviction became final, the special issues did not provide "a basis for the jury to give meaningful consideration and effect to [McGowen's] mitigating evidence" of his disadvantaged background.[50]

**D**

Although the district court did not find the prosecution's closing argument particularly problematic, we conclude that it also contributed to the *Penry* concerns.  The prosecution accused defense counsel of ignoring the special issues and focusing only on "life or death."  In discussing the future dangerousness issue, the prosecution emphasized "keep[ing] someone else from dying down the road," while discounting the relevance of the mitigating background evidence, calling it a "cop-out."  This is similar to the prosecution's closing argument in *Tennard*, in which the prosecutor told the jury that "the reasons why [Tennard] became a danger are not really relevant.  The fact that he is a danger, that the

---

[48] *Id.* at 210.

[49] *Id.* (quoting *Nelson v. Quarterman*, 472 F.3d 287, 298 (5th Cir. 2006) (en banc)).

[50] *Id.* at 212.

No. 10-70014

evidence shows he's a danger, is the criteria to use in answering that [future-dangerousness] question."[51] As in *Brewer*, there is "a reasonable likelihood that the jurors accepted the prosecutor's argument . . . that all they needed to decide [were the special issue questions], necessarily disregarding any independent concern that, given [McGowen's] troubled background, he may not be deserving of a death sentence."[52]

## IV

The Director argues that even if there is *Penry* error, it is subject to harmless-error review. In doing so, he urges this court to overrule its prior decision, *Nelson v. Quarterman*.[53] *Nelson* may not be overruled "in the absence of an intervening contrary or superseding decision by this court sitting *en banc* or by the United States Supreme Court."[54] The Director points to no intervening contrary or superseding decision by the Supreme Court or this court sitting en banc. Accordingly, we are bound by *Nelson*.

## V

Because of its resolution of the *Penry* claim, the district court did not address the merits of McGowen's remaining punishment-phase claims. Instead, the district court noted in a footnote that all but three of those claims suffered from procedural defects and found no merit in the three properly presented claims—insufficient evidence of provocation, insufficient evidence of deliberateness, and failure to define the term "deliberately."

---

[51] *Tennard v. Dretke*, 542 U.S. 274, 289 (2004) (internal quotation marks omitted).

[52] *Brewer v. Quarterman*, 550 U.S. 286, 293-94 (2007) (footnote omitted).

[53] 472 F.3d at 314-15.

[54] *E.g., Caillouet v. First Bank & Trust* (*In re Entringer Bakeries, Inc.*), 548 F.3d 344, 348-49 (5th Cir. 2008) (quoting *United States v. Lipscomb*, 299 F.3d 303, 313 n.34 (5th Cir. 2002)) (internal quotation marks omitted).

No. 10-70014

The district court also denied McGowen's habeas claims relating to the guilt/innocence phase of his trial, holding that "adequate and independent state law bars federal consideration of his remaining claims."

The district court refused to grant a COA as to any of the foregoing denied claims. McGowen now seeks a COA in this court as to some, but not all, of the claims denied by the district court.

**A**

McGowen has not requested a COA in this court on six of the fifteen claims denied by the district court. These abandoned claims include: (1) trial counsel provided ineffective assistance by failing to address juror misconduct adequately; (2) the trial court refused to define the term "deliberately" in the first special issue; (3) the future dangerousness special issue is invalid; (4) Texas's capital sentencing statute unconstitutionally affords the jury too much discretion; (5) Texas's manner of execution amounts to cruel and unusual punishment; and (6) the cumulative effect of the alleged errors denied McGowen's constitutional rights. Accordingly, we need not consider whether McGowen is entitled to a COA on these claims.

**B**

McGowen has also abandoned several of the claims in his application for a COA by inadequate briefing. McGowen attempted to brief three of his COA claims by summarily incorporating the arguments he made in his habeas petition in the district court as well as earlier arguments in his COA brief relating to another claim. These three claims include: (1) the evidence was insufficient to support the jury's affirmative answer to the provocation special issue; (2) the evidence was insufficient to support the jury's affirmative answer

to the deliberateness special issue; and (3) the State improperly withheld exculpatory evidence in violation of *Brady v. Maryland*.[55]

We have held that a COA applicant waives claims by directing the appellate court to briefing before the district court to support his request for a COA.[56] McGowen's reference to his habeas petition therefore does not preserve his claims. To the extent McGowen vaguely refers to arguments made earlier in the COA brief in support of his actual innocence claim, he fails to explain how those arguments are related to the two special-issue evidentiary claims or demonstrate a *Brady* violation. Accordingly, McGowen has waived these claims by failing to brief them adequately.[57]

McGowen has also waived claims that his constitutional rights were violated because the jury was not given the option to sentence him to life without parole. Although McGowen dedicates three pages of his COA brief to these claims, the substance of the argument is no more than an extended reference to his briefing in the district court. Specifically, McGowen: lists the various life-without-parole claims that he presented to the district court; summarily argues that the district court erred in finding he had procedurally defaulted on these claims "[f]or the reasons presented in his [habeas] brief"; requests that these claims be remanded to the district court in the event his *Penry* claim is reversed; summarily contends he presented these claims "at the first opportunity" after a change in Texas law in 2005; and argues he has been an exemplary prisoner and is not a future danger to society. He provides no citations to authority or the

---

[55] 373 U.S. 83 (1963).

[56] *Summers v. Dretke*, 431 F.3d 861, 870 (5th Cir. 2005); *see also Yohey v. Collins*, 985 F.2d 222, 224-25 (5th Cir. 1993) (a party cannot preserve arguments by attempting to incorporate arguments from earlier briefing).

[57] *See Woods v. Cockrell*, 307 F.3d 353, 357 (5th Cir. 2002) (denying issues raised in petition for COA as inadequately briefed).

record as required by Federal Rule of Appellate Procedure 28.[58] Accordingly, he has waived the life-without-parole claims by inadequately briefing them.[59]

Finally, McGowen waived his claim of jury misconduct. In his COA brief, McGowen vaguely references, without record citation or elaboration, "affidavit evidence from the jury which demonstrated that their verdict rested on unconstitutional considerations, prejudicial extraneous information, and other extraneous influences." He then broadly asserts he was denied his constitutional rights to due process, to an impartial jury, and to cross-examine and confront witnesses, citing case law for generic propositions regarding a defendant's right to an impartial jury. At best, McGowen has presented "conclusory and passing assertions" that his rights were violated by jury misconduct and has waived the issue by failing "to meaningfully brief [it]."[60]

## VI

The remaining three claims on which McGowen seeks a COA are his contentions that: (1) he is actually innocent; (2) trial counsel provided ineffective assistance by failing to investigate and present adequately both evidence of McGowen's innocence and mitigating evidence; and (3) his prolonged stay on death row constitutes cruel and unusual punishment.

## A

"A COA will issue only if the requirements of [28 U.S.C.] § 2253 have been satisfied."[61] Section 2253(c) permits issuance of a COA when "a petitioner has

---

[58] *See Int'l Women's Day March Planning Comm. v. City of San Antonio*, 619 F.3d 346, 369 n.31 (5th Cir. 2010) (quoting FED. R. APP. P. 28(a)(9)(A)) ("'The appellant's brief must contain . . . [an] argument, which must contain . . . appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies.'" (alterations in original)).

[59] *See Summers*, 431 F.3d at 870; *Woods*, 307 F.3d at 357.

[60] *Hinojosa v. Butler*, 547 F.3d 285, 291 n.2 (5th Cir. 2008).

[61] *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003).

made a 'substantial showing of the denial of a constitutional right.'"[62] Under this standard, when a district court denies habeas relief by rejecting constitutional claims on their merits, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."[63] When the district court denies the petition on procedural grounds without reaching the merits, the petitioner must show "that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling."[64]

The petitioner must demonstrate "'something more than the absence of frivolity or the existence of mere "good faith" on his or her part.'"[65] However, a COA should not be denied "merely because [the court] believes the applicant will not demonstrate an entitlement to relief."[66] In addition, any doubts as to whether a COA should be granted are resolved in the petitioner's favor, and the severity of the death penalty may be a consideration in deciding whether a petitioner has made a "substantial showing."[67] In considering a COA, this court does not fully consider the legal and factual basis of the petitioner's claims, but

---

[62] *Id.* (quoting 28 U.S.C. § 2253(c)).

[63] *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

[64] *Id.*

[65] *Riley v. Cockrell*, 339 F.3d 308, 313 (5th Cir. 2003) (quoting *Miller-El*, 537 U.S. at 338).

[66] *Miller-El*, 537 U.S. at 337.

[67] *Hill v. Johnson*, 210 F.3d 481, 484 (5th Cir. 2000) (citing *Fuller v. Johnson*, 114 F.3d 491, 495 (5th Cir. 1997)).

rather "conduct[s] an overview of the issues presented and a general assessment of their merits under the deferential standard of 28 U.S.C. § 2254(d)."[68]

## B

The three remaining claims were raised for the first time either in McGowen's amended application, filed in state court in 1998 over a year after his initial application, or in his successive application, which was filed in state court in 2008 while the federal habeas action was stayed. These claims were all dismissed by the Texas Court of Criminal Appeals on procedural grounds as an abuse of the writ under Article 11.071 of the Texas Code of Criminal Procedure.

Article 11.071 § 5(f) provides: "If an amended or supplemental application is not filed within the time specified under Section 4(a) or (b), the court shall treat the application as a subsequent application under this section." It is undisputed that neither the amended application filed in 1998 nor the successive application filed in 2008 was filed within the specified time, and they were treated as successive applications. The claims were denied as procedurally barred.

The procedural default doctrine "has its roots in the general principle that federal courts will not disturb state court judgments based on adequate and independent state law procedural grounds."[69] "[A] federal court will not entertain a procedurally defaulted constitutional claim in a petition for habeas corpus absent a showing of cause and prejudice to excuse the default."[70] Under an exception to this rule, courts will review such a claim without a showing of cause and prejudice "when the habeas applicant can demonstrate that the

---

[68] *Ortiz v. Quarterman*, 504 F.3d 492, 500 (5th Cir. 2007) (citing *Miller-El*, 537 U.S. at 336).

[69] *Dretke v. Haley*, 541 U.S. 386, 392 (2004).

[70] *Id.* at 388.

No. 10-70014

alleged constitutional error has resulted in the conviction of one who is actually innocent of the underlying offense or, in the capital sentencing context, of the aggravating circumstances rendering the inmate eligible for the death penalty."[71]

In the district court, McGowen challenged the procedural bar to federal habeas review on all three grounds set out above, contending: (1) there was no adequate and independent state procedural ground preventing the Texas Court of Criminal Appeals from reviewing the merits of his claims;[72] (2) any procedural default was excused by cause and prejudice; and (3) his actual innocence allows federal review. In his brief in support of an application for a COA in this court, McGowen appears to have abandoned the first two grounds and focuses only on the exception reserved for a "fundamental miscarriage of justice," or actual innocence.

Fundamental miscarriage of justice "is limited to cases where the petitioner can make a persuasive showing that he is actually innocent of the charges against him."[73] This "claim of 'actual innocence' is not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits."[74] Proving such a claim is "daunting indeed," requiring the petitioner to show, "'as a factual matter, that he did not commit the crime of conviction.'"[75] The petitioner "must support his allegations with new, reliable evidence that was not presented at trial and must show that it was 'more likely than not that

[71] *Id.*

[72] We have held that "Texas's abuse of the writ doctrine is a valid state procedural bar foreclosing federal habeas review." *Coleman v. Quarterman*, 456 F.3d 537, 542 (5th Cir. 2006).

[73] *Finley v. Johnson*, 243 F.3d 215, 220 (5th Cir. 2001).

[74] *Herrera v. Collins*, 506 U.S. 390, 404 (1993).

[75] *Fairman v. Anderson*, 188 F.3d 635, 644 (5th Cir. 1999) (quoting *Ward v. Cain*, 53 F.3d 106, 108 (5th Cir. 1995)).

No. 10-70014

no reasonable juror would have convicted him in the light of the new evidence.'"[76] Such "new, reliable evidence" may include, by way of example, "exculpatory scientific evidence, credible declarations of guilt by another, trustworthy eyewitness accounts, and certain physical evidence."[77]

## C

In support of his innocence claim, McGowen submitted several affidavits, which may be separated into two groups: (1) those purporting to provide McGowen with an alibi defense; and (2) those indicating that either McGowen's cousin Kindle or his brother Charles murdered Pantzer.

## 1

Affidavits purported to provide McGowen with an alibi. McGowen's older sister, Rose Ayers, stated that the day the murder occurred—March 11, 1986—was her birthday and that Roger was at her house to celebrate that day. Investigator Lisa Milstein testified she was told by several of McGowen's sisters about the birthday celebration. However, Milstein's testimony about others' out-of-court statements is clearly hearsay not within any exception and thus is inadmissible,[78] and as the district court explained, Ayers's testimony is irrelevant to the question of where McGowen was at 12:45 A.M. on March 11, when the murder took place.[79] Moreover, the statements "address matters which, by their very nature, were within the personal knowledge of the petitioner,"[80] and their reliability is therefore highly questionable. In addition,

---

[76] *Id.* (quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995)).

[77] *Id.* (citing *Schlup*, 513 U.S. at 324; *Sawyer v. Whitley*, 505 U.S. 333, 340 (1992)).

[78] *See* FED. R. EVID. 801-804.

[79] *See Schlup*, 513 U.S. at 327-28 (court may consider the probative force of "relevant evidence").

[80] *Moore v. Quarterman*, 534 F.3d 454, 464-65 (5th Cir. 2008).

No. 10-70014

McGowen's trial counsel, George Godwin, testified by affidavit that, in preparation for trial, he reviewed the State's entire file, he spoke with McGowen at length several times, McGowen never denied the allegation that he shot Pantzer, and McGowen never furnished an alibi witness. McGowen's other trial counsel, Ronald Mock, testified similarly by affidavit, also noting that "in light of the confession, my discussions with the applicant, and my investigation of the case, I could not have presented an alibi defense without suborning perjury." As the district court held, "[n]o jury would find reasonable doubt as to [McGowen's] identity based on the purported alibi defense," particularly considered in conjunction with his admitted confession.

**2**

Affidavits indicate that either McGowen's cousin Kindle or his brother Charles murdered Pantzer. The district court engaged in an exhaustive review of several affidavits McGowen submitted in order to rebut his identity as the killer. Most consisted of hearsay statements from various people indicating that Kindle had told them Roger McGowen's brother, Charles, was the person who shot Pantzer. The district court noted that Charles, who was killed in March 1987, had become "an easy target upon which to cast blame." As noted above, Kindle, who is McGowen's cousin, was in the Club both before and after the shooting, found the bullet fired from the 0.25 caliber pistol, and gave it to the police.

Kindle's affidavit, which is a typed statement dated May 10, 2007, containing numerous handwritten additions and alterations, is carefully crafted in such a way as to disclaim any personal involvement with the robbery or murder. The district court noted that, when he signed his statement in 2007, Kindle was serving a federal prison sentence for trafficking cocaine and that he "has gone from being a suspect in this case to being McGowen's star witness." In the affidavit, Kindle admitted to being in the Club twice on the night of the

27

murder, but again denied involvement. He stated that McGowen's now-deceased brother, Charles, told him he entered the Club to rob it and that "the woman shot at him so he shot back, and then ran out of the club." He stated he saw Charles later that night and that Charles was bleeding because "the woman . . . hit him in the leg, his thigh area." Charles asked Kindle about pain killers, and Kindle talked to his wife, Shuntel Woolridge, about giving Charles Tylenol. Kindle told his wife Charles "had robbed a place and shot someone" with a man named Robert Richmond. Kindle stated that, when questioned by the police weeks later, he told them "Roger [McGowen] had not committed the shooting."

Shuntel Woolridge stated in her affidavit that Charles had called Kindle the night of the murder asking for something for the pain, and she gave Kindle some prescription Tylenol to take to Charles. She also stated Kindle had told her "Charles had been shot trying to rob some gay bar" and that she told the police "Charles did it." She further stated, in conflict with Kindle's admission that he was at the Club before the shooting, that Kindle "had been with me all afternoon before that call came."

Another one of McGowen's brothers, Michael McGowen, stated Kindle had told him "Roger had nothing to do with the shooting" and that two uncles had told him Charles committed the crime. McGowen's sister, Rose Ayers, stated she had heard from Kindle's mother, Brenda, that Charles had committed the robbery but that she was not sure if Brenda "was just trying to protect [Kindle]." McGowen's sister, Valorie Foote, stated she had "heard that Charles committed this crime and not Roger, but I don't know." McGowen's sister, Michelle Perkins, stated she heard from "Uncle Jimmy" when he "got drunk" that "Charles murdered someone and Roger was taking the blame." She also stated she remembered Charles was shot in the leg "in early 1986" and that he stated someone had shot him. Joe Williams, an inmate, stated he saw Charles on the

night of the murder, that Charles "had been shot in the thigh," and that "Charles told me that night that he had tried to rob a place [and] got in a shoot out."

Norman Ray Willis, who testified against McGowen in the punishment phase of the trial, stated Kindle had told him Charles was the killer, but Willis also stated that Kindle was "sly" and "shady" and could not be trusted and that he thought Kindle was the killer. Martha Jackson, whose daughter once dated McGowen, stated she had heard from a woman named Linda Faye Allen, who did not submit an affidavit, that "Kirkwood" (presumably meaning Kindle) had bragged to Allen about the murder.

The district court concluded, based on these affidavits, that McGowen had not presented reliable evidence demonstrating it was more likely than not that no reasonable juror would have convicted him in the light of the new evidence. We agree. The Supreme Court's decision in *Herrera v. Collins*[81] is instructive. In *Herrera*, the Court evaluated a petitioner's evidence purportedly demonstrating his actual innocence after "assum[ing], for the sake of argument," that "a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief."[82] The Court noted that the petitioner's newly discovered evidence in that case consisted solely of affidavits, which are disfavored in the new trial context "because the affiants' statements are obtained without the benefit of cross-examination and an opportunity to make credibility determinations."[83] Further, the affidavits in that case were "particularly suspect" because, with one exception, they consisted of hearsay and contained inconsistencies.[84] Moreover,

---

[81] 506 U.S. 390 (1993).

[82] *Id.* at 417.

[83] *Id.*

[84] *Id.* at 417-18.

the affidavits were given over eight years after the trial and after the alleged perpetrator of the murders was dead, with no explanation for the delay.[85] The Court concluded that, although the statements in the affidavits contradicted the evidence received at trial such that "the jury would have had to decide important issues of credibility," the petitioner's "showing of innocence [ten years after trial] falls far short of that which would have to be made."[86]

There are several similarities between the new evidence presented in *Herrera* and that presented in McGowen's case. First, McGowen's evidence consists solely of affidavits, most of which are based on hearsay. Among other inconsistencies, some implicate Kindle, while others implicate Charles. With regard to the evidence indicating Charles may have been shot while robbing the Club, the district court pointed out the existence of other evidence contradicting this theory, stating:

> Kindle found the slug Ms. Pantzer fired from her gun. The autopsy describes a wound in Charles McGowen's thigh, but does not show a corresponding exit wound. Unless the bullet struck Charles McGowen and then fell to the floor, the assailant (if injured at all) would have received a through-and-through wound. McGowen has not pointed to anywhere in the record showing that the assailant left blood on the floor. The record does not mention a trail of blood left by a fleeing gunman. The question of whether the gunman was even injured is important, as no witness testified that the masked man staggered away in pain.

In addition to these issues, the timing of the affidavits is suspect. Williams's and Jackson's affidavits were prepared in 1998, eleven years after the trial, and most of the others, including Kindle's, were prepared in 2007, twenty years after the trial. All of the affidavits were prepared after one of the alleged perpetrators, Charles McGowen, was dead. Moreover, and more importantly, these

---

[85] *Id.*

[86] *Id.* at 418-19.

statements must be evaluated in conjunction with McGowen's admitted confession.  Challenging McGowen's identity as the killer at trial in light of the confession, particularly without any physical evidence, would have been difficult.

As in *Herrera*, the statements in the affidavits contradict the evidence presented at trial regarding the identity of the murderer and would have required the jury to make credibility determinations.  However, given the many issues regarding the affidavits, outlined above, McGowen has not made the "extraordinarily high" "threshold showing" required.[87]  Moreover, his affidavit evidence stands in sharp contrast to the examples provided by the Supreme Court of evidence that could potentially make such a showing, such as "exculpatory scientific evidence, credible declarations of guilt by another, trustworthy eyewitness accounts, and certain physical evidence."[88]  He therefore has not presented "new, reliable evidence that was not presented at trial [showing] that it was 'more likely than not that no reasonable juror would have convicted him in the light of the new evidence.'"[89]  Accordingly, reasonable jurists would not find it debatable whether the district court was correct in its ruling,[90] and McGowen is not entitled to a COA on his denied claims.

## VII

We conclude that the jury could not meaningfully consider relevant mitigating evidence presented by McGowen in determining whether a death sentence was appropriate.  Therefore, the district court did not err in granting habeas relief on McGowen's *Penry* claim.  McGowen is not entitled to a

---

[87] *Id.* at 417.

[88] *Fairman v. Anderson*, 188 F.3d 635, 644 (5th Cir. 1999) (citing *Schlup v. Delo*, 513 U.S. 298, 324 (1995); *Sawyer v. Whitley*, 505 U.S. 333, 340 (1992)).

[89] *Id.* (quoting *Schlup*, 513 U.S. at 327).

[90] *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

No. 10-70014

certificate of appealability on the claims denied by the district court because he has abandoned all but three of those claims, which were themselves procedurally defaulted.     McGowen has also not demonstrated that the fundamental miscarriage of justice exception applies to allow federal habeas review of those claims.

*     *     *

For the foregoing reasons, we AFFIRM the district court's judgment.